# PATRICK ROGAN,

*vs.*

# MARTIN O. WALKER, ELLIS BAKER and JAMES ROGAN.

IN CHANCERY, ON APPEAL FROM THE CIRCUIT COURT OF IOWA COUNTY.

R. executed his bond to W., for $1,659.14, conditioned for the payment of $829.58, in four years from the date thereof, and $29.04, interest thereon, to be paid annually ; and W. executed to R., his deed for the conveyance of certain lands "for and in consideration of the said bond hereinafter recited, and of one dollar," * * "conditioned and provided, always, any thing herein contained to the contrary notwithstanding, that if the said (R.) shall fail to comply with the conditions of the said bond, or any part thereof, then this conveyance and the estate hereby created shall cease, determine, and be of no effect. And the said (W.) shall have the right to re-enter and take possession of said premises, and to sell and convey the same to any other person or persons, and to keep and retain all the monies paid herein, without recourse either in law or equity." Held that this deed conveyed an estate *in presenti.*

Held also, that the condition here expressed, is a condition subsequent.

Held also, that though the bond were not paid at the day, there was an equity of redemption.

Equity will relieve against conditions subsequent, in support of the estate vested.

Whether a condition be precedent or subsequent, does not depend upon any precise form of words, or their place in the deed, but must be determined by the whole instrument.

Equity will relieve against a condition subsequent, when compensation can be made ; and as a general rule, interest is a legal compensation when the condition is the payment of money.

Whatever may be the form of a conveyance, if it be made as security for a loan of money, equity will hold it a mortgage.

An equity of redemption is not the creature of contract, but an implication of law from the transactions of the parties.

Whenever the transaction is a loan of money, the deed given for security, though absolute on its face, will be held a mortgage.

On a bill filed to redeem, parol evidence is admissible to show the real nature of the transaction.

It is not necessary to file a bill to reform the deed when the equity of redemption

is ripe for execution; but a bill to redeem may be filed without asking a reformation of the instrument.

An attempt to set up a deed as absolute, which was given only as security, in order to defeat an equity of redemption, is a fraud upon the law.

Where A. gave his bond to B., for money loaned for the purpose of purchasing land, and with the money so loaned, purchased the land, and took the title in the name of B., as security for the money and interest. Held, there was a resulting trust in B. for the use of A.

Parol proof is admissible to show the transaction out of which a trust results by operation of law.

So parol proof is admissible to discover an equity of redemption arising out of the transaction of the parties; not to vary or control the deed, but to prevent its fraudulent use, and to preserve the equity of redemption which the written contract of the parties does create and cannot destroy.

This is a bill to redeem certain lands situate in the counties of Jefferson and Dodge, and for other relief, and was filed in the Circuit Court of Iowa county, the 11th day of April, 1849. At the April term of said Circuit Court, the cause came on to be heard upon the bill, answer and proofs, and a final decree for redemption was made therein at the said term.

The bill alleges, that James Rogan, in 1836 or 1837, went into possession of two several tracts of wild, unimproved lands, lying about half a mile apart from each other, then belonging to the United States, and known as the north east fractional quarter of section 5, town 8, range 15, in the county of Jefferson, and the north east quarter of section 32, town 9, range 15, in Dodge county; and remained in the quiet and peaceable possession thereof as a settler on the public lands, until the time of the land sale in Feb. 1839. That at, or soon before the sales of the public lands in November, 1838, Martin O. Walker, the defendant, then of the city of Troy, N. Y., appeared in the town of Milwaukee and gave out, and caused to be given out amongst the settlers on public lands then about to be sold, that he had large sums of money

belonging to himself and one Ellis Baker, which he proposed to advance and lend, to purchasers at said land sale on security of such lands, and on the following terms and conditions: That Walker would purchase in his Walker's own name, at the minimum price of $1.25 per acre, the land which the borrower of the money desired to purchase, and take as security for the loan the bond of such borrower, conditioned for the payment of a sum double the amount, at such minimum price, payable at a future day (four years) with interest at the rate of three and a half per cent. per annum, and would convey such tract or tracts of land to the borrower, by deed, with condition annexed and forming part of the deed, that if the grantee named in such deed should fail to comply with the condition of such bond, then that such conveyance, and the estate thereby created should cease, determine and be of no effect, and the said Martin O. Walker, or his legal representatives should have the right to re-enter and take possession of the premises thereby conveyed, and to sell and convey the same to any other person or persons, and to keep and retain all monies paid thereon, without recourse either in law or equity.

That the said James Rogan finding himself short of the money necessary to purchase the said tracts at the public sale, and hearing of the proposals of the said Walker, applied to him for a loan of money sufficient to enable him to buy the lands at the minimum price ; that thereupon the said Walker consented to do so, upon the terms of said proposals and givings out, and to give the said James Rogan credit thereon for the term of four years, to which the said James Rogan assented, and an agreement was made between them

34

upon such terms before the sale of the said lands, or any part thereof, by the United States. That in pursuance of said agreement, the said Rogan on the 18th day of February, 1839, did execute and deliver to said Walker his bond or obligation under seal, in the penalty of $1,659.14, conditioned for the payment to said Walker and Baker of the sum of $829.58, on the 18th day of February, 1843, and annually on the 18th day of February, of the further sum of $29.04 interest thereon, and for the payment of all taxes and assessments *on the land that day conveyed by the said Walker to the said Rogan ;* and that in pursuance of the said agreement, on the same 18th day of February, Walker executed and delivered to said Rogan, his deed of conveyance of the said lands, in fee simple, in consideration of the said bond recited in the deed, and of one dollar, with covenants of warranty against the acts of Walker, " conditioned and provided always, anything herein contained to the contrary notwithstanding, that if the said party of the second part, (James Rogan) shall fail to comply with the conditions or any part thereof, of a certain bond, bearing even date with these presents, and hereinafter described, then this conveyance, and the estate hereby created shall cease, determine, and be of no effect. And the said party of the first part, shall have the right to re-enter and take possession of said premises and to sell and convey the same to any other person or persons, and to keep and retain all monies paid herein without recourse either in law or equity, which bond is in the words and figures following." Then follows a recital of the bond as described above.

That afterwards, on the the 23d day of February, 1839, Walker in pursuance of the said agreement, purchased the lands of the United States, and receiv-

ed the receiver's receipt for the same, numbered as described in the deed of conveyance; that the purchase was at the minimum price and amounted to one-half of the sum mentioned in the condition of the bond; that the purchase was for and on account of the said Rogan, and was the true and only consideration of the said bond; that by the said deed Rogan became seized in fee simple, absolutely of the lands, subject to the rights of the said Walker and Baker, as incumbrances thereon, for all sums justly due, or to become due on foot of the said bond or obligation of Rogan to them. That the whole of the said transactions of the making and delivery of the said bond, and the said deed of conveyance and of the purchase of the lands were all part and parcel of the same agreement between Walker and James Rogan, previously had between them as herein above stated, and that the true intent, purpose and object of the said agreement, and of the several transactions above named, was the loan of money from the said Martin O. Walker and Ellis Baker to the said James Rogan, and the security thereof. That the said bond of Rogan, and the condition in the deed of Walker were intended by the parties, to secure the payment of the said loan, and that Walker became the purchaser of the lands for the sole purpose of securing the payment of the loan aforesaid, and without any intention of acquiring or holding the said lands, or any part of them, for himself or Baker.

That the condition in the deed operates in law as a mortgage; that it was inserted for the purpose of defeating the equitable rights of redemption, in case Rogan should fail to pay when the bond should become due and payable, according to the conditions thereof.

That James Rogan remained in quiet possession of the said two tracts, from the time he first took possession, until the time of the transactions with Walker and has ever since remained in possession of the N. E. qr. of sec. 32, and ever after remained in possession of said N. E. fr. qr. of sec. 5, until the conveyance thereof to the complainant, when the complainant went into possession, and has continued in possession ever since, and that such possession has been adverse to all the world, and that Baker nor Walker never had possession. That at the time of purchase, the tracts were of about equal value, and that the improvements upon the same are now of about equal value. That the N. E. qr. of section 32 is still owned by James Rogan, and is abundant security for one half the principal and interest of the bond remaining unpaid.

That on the 20th day of January, 1842, James Rogan and wife conveyed the N. E. fr. quarter of section 5, to John Masterson, by warranty deed, and on the 30th July, 1844, Masterson and wife conveyed the same to the complainant, by deed of warranty.

That some time in the fall of the year 1847, Walker commenced an action of ejectment against the complainant for the recovery of the said N. E. fr. quarter of section 5, in the Jefferson Circuit Court, which was removed by change of venue to La Fayette county; claiming title to, and right of possession of the said tract, by reason of the failure of the said James Rogan to pay the money due upon said bond, at maturity thereof.

The complainant further alleges, that he had hoped that Walker would have admitted his right to redeem the said tract of land last described on default of

James Rogan, to fulfil the conditions of his bond, by the complainant's paying a just proportion of the said sum due, chargeable upon said tract, or that the said Walker would have admitted the complainant's right to redeem his said tract, and to receive a release or satisfaction of said condition in the deed, upon payment of the whole of the principal and interest justly due on foot of said bond of James Rogan, the complainant having been always ready and willing to pay, and now offering to bring into court, such sum as shall be justly due and chargeable against said tract, or necessary to enable him to redeem his said tract; that the said Walker had wholly refused to comply with said requests, and denies the right of the claimant to redeem, pretending, &c.

The bill prays that an account may be taken of the amount due upon said bond of said James Rogan, and that the said James Rogan be decreed to pay the same when ascertained. And in default of James Rogan to pay the same, the complainant may be allowed to pay the same or so much, and such part thereof as to the court may seem just and sufficient to enable him to redeem his tract, and that he may have a decree of foreclosure against James Rogan, of his equity of redemption on his said tract for the amount the complainant may be obliged to pay in redemption of his tract, and that on payment of the amount due to the defendants, they may be decreed to satisfy and release the said condition in the said deed; and for such other assurance or conveyance as may be necessary, and for general relief, and for an injunction from the further prosecution of the action of ejectment.

Neither Baker nor James Rogan answer. The defendant Walker answers, denying the possession of

James Rogan in 1836 or 1837, or at any other time. Admits he did claim to have a squatter claim to said land, or a right, by common consent among the settlers of the neighborhood, to buy the lands when they should be brought into market; but denies that it gave any right to possession, there being no tenement or resident thereon. He denies that he caused it to be given out among the settlers that he had money to loan to the purchasers of the public lands, or to any other persons, on the security of such lands, or any other securities, nor on the terms and conditions stated in the bill. He further denies that he proposed to purchase the lands of the settlers, or any of them, taking the title in his own name, taking bond for the money at double the amount, and to convey by deed, with condition annexed, as stated in the bill, and denies the proposals and proffered arrangement set out. He denies that James Rogan applied to him for a loan of money to purchase the said tracts of land; but admits that Rogan did apply to him about the first of December, 1838, for a loan of $1,000 to buy land with. He denies that he, in any manner or form, assented or agreed upon the terms and conditions, as alleged in the bill, to make any loan whatever to Rogan for the term of four years, or any other term, as alleged in the bill; but says, that to the application of Rogan for a loan as aforesaid, he replied that he had no money to loan, nor was he making any loans whatsoever, nor upon any terms whatsoever, but that he came to Wisconsin to attend the land sale for the purchase of land. Denies the agreement between Rogan and himself as alleged. He denies that the bond of Rogan was given pursuant to any such agreement as is alleged; says the bond was not given until the 27th of February, and was ante-dated on the 18th,

June Term, 1853.

Rogan vs. Walker et al.

so that the payments should fall due at the same time with payments on other obligations held by the defendant in Wisconsin. He says that such bond was made, executed and delivered on a conditional sale of the said tracts of land, made by him to Rogan after he had purchased the same of the United States, and which was not in pursuance of any agreement for a loan of money, nor in pursuance of any other agreement whatever, relating to said lands, between him and Rogan prior to the purchase of said lands. But he admits that he did say to the said Rogan, that if he should become the purchaser of said lands, he would sell the same to the said Rogan on terms to be agreed on after such purchase, giving to Rogan the preference over any other person on equal terms ; but Rogan was under no legal obligation to buy, nor he to sell, until the 27th of February, 1839. Admits the bond is truly recited, and says that in December, 1849, Baker assigned to him all his interest in the bond.

Admits the execution and delivery of the deed, and that it is correctly set forth, but says it was really executed on the 27th day of February, and not on the 18th, and denies that it was made and executed in pursuance of any such agreement as is alleged in the bill of complaint ; and says it was executed on an agreement made between him and Rogan for a conditional sale of said lands *after* he had purchased them from the United States.

Admits that he did, on the 23d of February, 1839, purchase the lands of the United States, at the minimum price of one dollar and a quarter per acre ; but denies that he purchased them in pursuance of any agreement with Rogan, or with any agreement that the purchase should " enure to the benefit of Rogan, or

any other person than himself." He denies that the purchase was for, or on account of Rogan, and that the payment for the lands, or the money therefor, was the true and only consideration for said bond, and says that the true consideration of said bond was the conditional deed aforesaid.

He admits the delivery of the deed, but denies that Rogan became thereby seized in fee simple of the land in his own right, subject to the rights of Walker and Baker as encumbrances thereon, for the sums to become due upon the bond ; but insists that by the failure of James Rogan to comply with the conditions of his bond, the deed thereby became absolutely void in law, and of no binding effect upon him, the defendant. He denies that the true intent, purpose and object of the said agreement, or of the said several transactions, or any of them, was the loan of money from the said Walker to the said Rogan, or the security thereof. Denies that the bond was for the payment of the alleged loan, or any loan, and that he purchased the land without any intention of acquiring and holding the said lands for himself ; but says, that he did purchase them with the intention of holding the same until he could sell the lands at a reasonable profit, as he legally might do. Denies that the deed and bond operated as a mortgage, because Rogan had no title by which a mortgage by agreement or intendment of law could operate. He declares that he refused to sell the lands and take a mortgage, or to, in any way part with his title, until he should be fully paid ; that the sale was only to take effect on payment, and to be utterly void in case of non-payment at the time stipulated ; and that, inasmuch as Rogan had no title to the lands prior to the deed, and could not convey, and did not convey the

lands as security for the loan of money, no equitable

rights of redemption ever existed; and claims, that his, the defendant's title, has become absolute and perfect.

Admits the payment of the first year's interest, but denies any other payment.

Admits the commencement of the action of ejectment, and insists upon his absolute title, in consequence of the failure of James Rogan to pay his bond at maturity; and denies all equity of redemption in James Rogan or his representatives, and places his whole defence upon the legal effect of his deed and the failure to fulfil the conditions of the bond.

There are other matters alleged in the answer, not responsive to the bill, and as no proof has been taken to sustain them, they need not be stated.

To this answer a general replication was put, and proof afterwards taken on the part of the complainant, the material portion of which is given.

The following is the testimony produced at the hearing :

*Daniel Finch*, a witness produced by complainant, testified : I lived in the years 1838 and 1839 in the town of Koshkonong, Jefferson county. I lived here previous to the land sales ; the land sales commenced in February, 1839. I saw Martin O. Walker some two or three weeks before the land sales at my uncle's house in the town of Koshkonong. Mr. Walker's business, as he then made it known, was to buy land for settlers. He proposed then that he would buy their lands, and let them have it back at twenty shillings per acre, if he was allowed to bid the land off at ten shillings per acre. The settlers were to pay the twenty shillings per acre in four years, with seven per cent. interest, and he was to hold the land in security. Af-

JUNE TERM, 1853.

Rogan
vs.
Walker et al.

ter that time, I saw him at the time of the land sales at Milwaukee. Before I saw him at Milwaukee, I understood him that he would buy lands for all who desired it, provided they had improvements. I saw several deeds made out by him at Milwaukee. At my uncle's house, B. W. Finch, in the town of Koshkonong, I saw him make two written contracts of the terms upon which he would purchase the lands for the two persons named therein. He was to receive twenty shillings per acre in four years, with seven per cent. interest, from said two persons. I made a contract with Mr. Walker at Milwaukee to purchase an eighty acre lot for me. I was to pay him for the land in two years, at the rate of two dollars per acre, and seven per cent. interest on the $160.00. Walker gave me his name and residence, and I had his name entered on the claim list. The land was bid off in his name at the sales. The first regulations I saw made about claims by claimants, I saw in Milwaukee in the winter, 1836. They then adopted an instrument called claim constitution. They appointed a register; each man that had a claim signed the constitution, and had the numbers of his lands registered. In that constitution they bound themselves to protect each other. After that, they formed different districts; each district had a register. At the time of the sale, each district appointed a bidder to bid the lands off for the different claimants, of whom he had a list. The land was to be bid off at ten shillings per acre, and no one was to bid against the other. When the land was bid off by the bidder, it was for the benefit of the claimant, and entered in his name, except when the lands were bid off by others, who advanced the money for the settlers, and then their names were in-

serted. At the time of the sale, it was generally
known that Mr. Walker would buy the lands for the
settlers upon the terms already mentioned, so far as I
know. I don't know of his making different offers
except where he contracted for two years. Mr. Walker entered Ellis Baker's name in the bonds, or in other
words, the bonds were made payable to Walker and
Baker.

*Cross-examination.*—I was present when two different written contracts were made at my uncle's
house. The parties were Walter Finch and John
Finch to one, and Benoni Finch to the other. The
contracts were signed by Walker only. I read the
contracts myself. They were to pay Walker twenty
shillings per acre in four years. The contracts contained a statement of the terms on which he would
purchase their lands. The contracts were left in possession of those he agreed with. At that time, he
contracted with no other persons but those mentioned.
I don't know of any other contracts made by Walker
with any other person, from that time, till I went to
Milwaukee to attend the land sales, which was two or
three weeks. I made my contract with Walker at
Milwaukee. My contract differed in terms with the
two I just mentioned. James Rogan resided at
Watertown in 1836, and I suppose that he resided
there at the time of the land sales. I was present at
Milwaukee when contracts were made by Walker with
others. I was in his office a good deal of the time. I
could mention two persons with whom he made contracts. I do not recollect the names of others.

Mr. Walker made these contracts previous to the
sale with the settlers, and after the contracts were

made, the lands were bid off in Walker's name. Walker was not present at the sale.

*Marcellus Finch*—I am acquainted with Patrick Rogan, plaintiff, and James Rogan and Martin O. Walker, two of the defendants  The first I heard or knew anything of Walker was in the winter of 1838 to 1839 ; I heard that Walker had ($60,000) sixty thousand dollars to loan to the settlers ; after that, I think in January, 1839, Walker came to my uncle's, in the town of Koshkonong, in company with John T. Haight, who introduced Mr. Walker to my uncle. Mr. Walker said he had money to buy lands with for the settlers. · He stated that he required his money doubled in four years and seven per cent. interest per annum.  He requested my uncle to find him customers at that rate ; he staid at my uncle's two nights and one day.  Before Walker left he made out a memorandum of the conditions he required, and left it with my uncle for him to show to his neighbors that wanted money to secure their lands.

He gave the people to understand that he did not want to enter unimproved lands, such that was likely to be deserted and left on his hands.  Walker said there was land enough unoccupied, that he could purchase if he wished to buy land for the sake of the land, that it was the interest he wished to make on his money, and that he was not after the land.  I was at the land sale in Milwaukee, in February, 1839, and saw Mr. Walker there.  At the time I saw Walker at my uncle's, I tried to make a bargain with him for some money, but I thought his terms were too high. At Milwaukee, I applied to him for help, but he said he thought he had disposed of all he had at that time, but might be able to accommodate me before the sale

June Term, 1853.

Rogan
vs.
Walker et al.

was over. After the lands in our district were disposed of, he told me that he had no money to spare. I think he signed his own and Baker's name to the memorandum left at my uncle's. I saw this memorandum at my uncle's after the land sales, and I, together with my uncle, have since searched for it at my uncle's house, but we were not able to find it. ʼ The terms of the memorandum were, double in four years, with seven per cent. interest. He was to enter the lands in his own name, and hold it as security. I know James Rogan. In the fore part of March, I gave Walker the numbers of two eighties, and he entered it at private entry in his own name, after making a contract with me. This contract was that I should pay him four hundred dollars in four years, and twenty-eight dollars annually for interest, and that Walker was to deed the land to me upon executing a bond to him, conditioned to pay the four hundred dollars and interest in four years, and if not paid according to the conditions of the bond, then the deed to become void. When Walker made this bargain with me, he said, this was the way he made all his bargains. I have seen two other deeds of his and they were like mine.

*Cross-examination.*—There is a suit pending between myself and Walker, relative to this land Walker entered for me.

*Wm. H. Acker*—I am acquainted with Patrick Rogan and James Rogan, and know Martin O. Walker ; I resided at Watertown some two years previous to the land sales. The claim to the north east quarter of section five, in town eight, range fifteen, was in dispute between James Rogan and Cave Griswold. During the land sales this claim was settled by a committee chosen by the settlers at Milwaukee. The

claim was awarded to James Rogan. I was present at the land sales at Milwaukee. John Richards bid off all the lands in this precinct, he being appointed to do it by the settlers. He bid off the quarter section above described in the name of Martin O. Walker. According to the claim rules, a man had to reside upon the lands, build a house and improve three acres to entitle him to one quarter; for each additional quarter he had to improve three acres more, no matter, however, on what quarter. Each man was entitled to lay claim to four quarters. The south west quarter of section four was in dispute between James Rogan and John W. Cole. The claim was settled at Milwaukee during the land sales, and the land awarded to John W. Cole. The land sales were in February, 1839. Mr. Walker was then at Milwaukee, he was pointed out to me, as a man who was there for the purpose of buying land for the settlers. I don't know who has been in possession of the quarter section above described in section five, since the land sales, only from hearsay.

*Cross-examination.*—There were no improvements upon the quarter section, in section 5; from my own knowledge, James Rogan and William M. Dennis had cut hay on it, prior to the land sales, and while the land was in dispute. There was a potato patch on section 4, and perhaps part of it might be on section 5, in 1837.

*Peter V. Brown*—I know Patrick Rogan, James Rogan and Martin O. Walker, parties to this suit; I have known James Rogan since 1836, and Walker since 1837; I resided at Watertown in 1837, and James Rogan was here then. In the year 1837, James Rogan pretended to claim the northeast quarter of

section five, and did claim it up to the land sales. Previous to the land sales, James Rogan made an improvement of something less than an acre; a potato patch on said quarter section; I believe it was not fenced; Mr. Dennis, by consent of James Rogan, cut hay on this quarter, as I understood from Dennis; I think it was in 1837; in 1838 I cut hay on it, by consent of James Rogan and Griswold; it was given to James Rogan by the committee appointed; immediately after the land sales, James Rogan exercised rights of ownership over this quarter; Patrick Rogan claims it now. James Rogan claimed the northeast quarter section, in section 32, town 9, range 15, before the land sales, and claimed it up to his going to California in the year 1849.

*John W. Cole*, being duly sworn, says: I know James Rogan, Patrick Rogan, and have known Martin O. Walker, since 1838; I resided at Watertown previous to the land sales in February, 1839; James Rogan pretended to claim the northeast quarter of section 5, from the year 1837, up to the land sales; I think he had an improvement on it of something like three acres, previous to the land sales. He claimed, also, the southwest fractional quarter of a section 4; I laid claim to it also. At a trial at Milwaukee it was awarded to me; the quarter section on section 5, was awarded to James Rogan; I was present at the land sales in 1839, at Milwaukee; saw Walker there.

*William M. Dennis*—I know all the parties to this suit, except Baker; James Rogan claimed the northeast quarter of section 5, previous to the land sales in 1839; I was at the land sales in Milwaukee in 1839; saw Mr. Walker there; understood from him that

JUNE TERM,
1853.

Rogan
vs
Walker et al. his business was to loan money to settlers, or rather, that he entered land for them, giving them a term of years to pay the money back; I understood from him that he had a large amount of money to invest in that way; I recommended him to several, with whom he made contracts to enter their lands; immediately after the sales he executed conditional deeds to those for whom he purchased lands.

*Exhibit A.* proved to be in the hand-writing of Walker, and signed by him and Rogan.

"Memorandum of agreement between Baker & Walker, of the city of Albany, New York, and James Rogan, of Wisconsin Territory, as follows: Baker & Walker, (if allowed,) are to purchase, at the public sales in Milwaukee, in November and December, 1838, or in February and March next, one quarter section of land, in town 8, range 15, and section 5; one quarter section in town 8, range 15, and section 4; one quarter section in town 9, range 15, and section 32; duplicates to be taken in their name, and the said Rogan is to have the privilege of buying the same at twenty shillings per acre, payable in five years, with interest annually; take a deed and give a bond and mortgage back, with power to sell, and pay all legal costs and charges; the rate of interest to be at the rate of three and a half per cent. on the twenty shillings per acre. Agreed to at Milwaukee, November 19, 1838."

*Wm. P. Lynde*, for the complainant, made and argued the following points:

1st. If a conveyance of real estate be made as security, whatever be the form, equity will hold it a mortgage. *Flagg vs. Mann*, 2 *Sumner*, 487; *Parks*

*vs. Hale,* 2 *Pick.,* 211; *Barton vs. Mag,* 3 *Sanf. Ch. R.,* 450.

2d. A deed made for lands, to be absolute on the payment of certain notes, but in default of payment, to be void, is to be considered as a mortgage. 2 *Greenleaf's Cruise,* 79; *Carr vs. Holbrook,* 1 *Mis.* 240.

3d. The reverse of the last proposition is also true; a conveyance given as a mortgage, but to become a deed after a failure, without equity of redemption. will always be held subject to equity of redemption, And the reason of both propositions are the same. *Johnson vs. Grey,* 16 *Sergt. R.,* 361; *Stover vs. Stover,* 9 *id.,* 434.

4th. An absolute deed of lands, accompanied by a stipulation, either in or out of the deed, that an estate shall be reconveyed on payment of money, is a mortgage. *Erskine vs. Townsend,* 2 *Mass.,* 439; *Taylor vs. Weld.,* 5 *id.,* 109; *Casey vs. Rawson,* 8 *Mass.,* 15; *Harmon vs. Phillips,* 12 *Mass.,* 456; *Scott vs. McFarland,* 13 *Mass.,* 309; *Eaton vs. Whitney,* 3 *Pick.,* 181; *Hughs vs. Emmons,* 9 *Wheat.,* 489; 5 *Cond. R.,* 648. And this, even when there is no written defeasance; *Lane vs. Shearf,* 1 *Wend.,* 433; *Walton vs. Crowley,* 14 *Wend.,* 63; 5 *Gillman,* 53. If unaccompanied by any personal collateral engagement for the payment of the money. *Rice vs. Rice,* 4 *Pick.,* 349.

5. If it is doubtful whether the parties intended a conditional sale or a mortgage, courts of equity will regard it as a mortgage, such construction being the more just and equitable, tending to prevent oppression. *Poindexter vs. McCarmon, Dev. Eq. Rep.* 579; *Manner vs. Miller,* 5 *Lit.* 84; 2 *J. J. Marsh,* 471;

*Edgerton vs. Harper,* 3 *Lit.* 354 ; *Crane vs. Bonnell,* 1 *Green. Ch. R.* 354. And in order to ascertain the intention of the parties, courts look, not only to the deeds and writings, but to all the circumstances of the contract, and for this purpose will receive parol evidence. *Robertson vs. Campbell,* 2 *Call.* 421 ; *King vs. Newman,* 2 *Munf.* 40 ; *Thompson vs. Davenport,* 1 *Wash.* 125.

6. Once a mortgage, always a mortgage. 1 *Powell on Mort.* 127–116, 117, *note* 7. No agreement between the parties can take away the right of redemption in equity. *Powell on Mort.* 116, 117, *note* 2 ; 2 *Story's Eq.* 287 ; 4 *Kent.* 142 *to* 144.

7. This deed is in equity a mortgage. It is evident that it was made in the form it was, to secure the payment of money. The evidence also shows the transaction to have been a loan of money by Walker to Rogan. *Russell vs. Southard et al.* 12 *How.* 139 ; 2 *White & Tudor, Eq. Ca.* 62 ; *Law Lib.* 432 ; *Morris vs. Nickerson,* 17 *Pet.* 209 ; 1 *Johns. Ch. R.* 582, *Boyd vs. McLean.*

8. On the execution of the bond, the money became the money of Rogan, and Walker became a resulting trustee for Rogan. 1 *Sanf. Ch. R.* 57 ; 3 *id.* 450.

*Peter Yates,* for the defendant, appellant, insisted upon the following points :

I. The conversations and agreements of the parties, recited in the bill *preliminarily* or *prior* to the conditional deed, must be disregarded ; 1st, because all previous parol bargains and agreements are merged in the written agreement, or *conditional deed,* afterwards executed. *Hunt vs. Amidon,* 4 *Hill,* 345 ; *Miller vs.*

*Avery,* 2 *Barb. S. C. Rep.* 582. A deed or contract relating to lands must be *wholly in writing;* and cannot rest partly in writing and partly in parol.

And " parol evidence will not be received for the purpose of engrafting upon a deed any *condition,* limitation, or reservation *inconsitent* with its terms." 6 *Barbour's Supreme Court Rep.* 98.

Neither the *parties* to a deed, nor their *privies,* at law, *or in equity,* can contradict or substantially vary the *legal import* of a written agreement, or show that a deed *absolute upon its face,* was intended as a *mortgage.* 10 *Bar. Sup. C R.* 582.

2. All such understandings and parol agreements are also *void* by the *Statute of Frauds,* and for this reason must be laid out of view. *Lathrop vs. Hoyt,* 7 *Barb. Sup. C. R.,* 59 ; *Bander vs. Snyder,* 5 *Barb. S. C. R.* 63.

3. The matters thus recited in the introductory part of the bill, is an attempt to establish a resulting trust by *parol,* contrary to the provisions of the Statute of the territory in force at the time, since re-enacted, and now *in force. Statutes of Wisconsin Territory,* 162, *Sec.* 6 ; *and* 164, *Sec.* 2 ; *Rev. Stat.,* 388 ; *Sec.* 6, *and* 390, *Sec.* 2.

4th. Another answer to this attempt to establish a resulting trust by *parol,* contrary to the *form, tenor and effect of the Receiver's receipt,* and the *deed* thereafter executed, and the *statute* referred to, is, that the facts even as alleged do not prove a resulting trust in favor of the complainant. " To constitute a resulting trust in real estate, *it is necessary that the consideration money upon a purchase* should have belonged to the *cestui que trust,* or that it should have been advanced to him by *some other person* as a loan to him,

or that it should have been advanced as a gift to him."
*Getman vs. Getman*, 1 *Barbour's Chancery Rep.*, 499.

II.   This bill cannot be sustained as for the specific performance of a contract between the parties, because there is no bargain, contract or agreement by the complainant to purchase the land ; and there is therefore, no *mutuality* in the *remedy*.   1 *Johns. Ch. Rep.*, 282, 373, 374 ; 2 *Barb. S. C. Rep.*, 37, 270, 279, 280, 439, (1)

And even if such remedy on the part of the complainant ever existed, it has been *lost by delay*, or an *apparent abandonment* of the contract.   4 *Barb. Sup. C. Rep.*, 359 ;   *Wells vs. Smith*, 2 *Edwards' Ch. Rep.* 78.

III.   The deed set forth is in no sense a mortgage. " A mortgage is the *conveyance of an estate* by way of pledge *for the security of debt*, and to become void on payment of it."   4 *Kent's Com.* 135.   The complainant has " conveyed" no " estate" to Walker " by way of pledge for the security of debt," or otherwise.   The right of *redemption* upon the one side, pre-supposes the correlative right of *foreclosure* upon the other.    Where is the " estate" of the *complainant* here, " conveyed" to the defendant, Walker, " by way of pledge for the security of debt," that Walker can sell ?   It is that contained in the conditional deed *executed by Walker*, or there is none. If that be it, then we have the anomaly presented by this case, of an " estate" conveyed *by himself, to himself, to secure a debt due himself, to be foreclosed and sold to pay himself !*   Thus, Walker is both *mortgagor*, and *mortgagee*, by *one and the same instrument* at *one and the same time !!*   Can legal absurdity farther go ?

Again ;   Walker either has the security of this land for the amount conceded his due, or he has not.   If he has *not* the security of this land for the amount his

due, then, Mr. Complainant, you have *nothing to redeem*, and you have no business here.

If Walker *has* the "security" of this land for the amount you would now force upon him, then as *you* have never executed to *him* any "conveyance" thereof, or *mortgage* thereon, his lien thereon and title thereto, is in virtue of his own *non-conveyance*, or rather *your non-performance* of the *condition precedent* annexed to the grant of the estate at the time of its creation ; and, therefore,

IV.   This is a deed on condition expressed in the grant itself.

"An estate on condition expressed in the grant itself, is where an estate is granted, either in *fee simple*, or otherwise, with an express qualification annexed, whereby the estate *granted* shall either *commence*, be enlarged, or be defeated, upon a *performance* or *breach* of such qualification or condition.   These conditions are therefore either *precedent* or *subsequent*.   *Precedent* are such as must happen or be *performed before* the estate can *vest* or be enlarged ; *subsequent* are such by the failure or non-performance of which *an estate already vested*, may be *defeated*.   Thus, if an estate for life be limited to A. upon his marriage with B., the *marriage is a precedent* condition, and *till that* happens *no* estate is *vested* in A.   Or, if a man *grant* to his lessee, for years, that *upon payment* of a hundred marks *within the term* he shall have the fee, this also is a *condition precedent*, and the *fee simple passeth not till the hundred marks be paid.*"   2 *Black. Com.* (marginal paging) 154, *et seq.*

So far forth, Blackstone ; now what says Kent ?

A *precedent* condition is one which must take place *before* the *estate* can *vest*, or be enlarged ; as if a lease

be made to B. for a year, to commence from the first day of May thereafter, *upon condition that B. paid a certain sum of money within the time;* or if an estate for life be limited to A. upon his marriage with B.; here the *payment of money* in the one case, and the marriage in the other, are *precedent* conditions, *and until the condition be performed,* THE ESTATE CANNOT BE CLAIMED OR VEST. Precedent conditions must be *literally* performed; *and even a court of chancery will never vest an estate, when, by reason of a condition precedent, it will not vest in law."* 4 *Kent's Com.* 125.

Words of condition expressed in the grant itself, in the case at bar:

" *Conditioned and provided always,* anything herein contained to the contrary notwithstanding, that if the said party of the second part, shall fail to comply with the *conditions* or any part thereof, of a certain bond, bearing even date with these presents and herein described, then this conveyance and the *estate* hereby *created,* shall cease, determine, *and be of no effect,* and the said party of the first part, or his legal representatives, shall have the right to re-enter," &c.

Lord Bacon's definition of condition:

" By the word *condition,* is usually understood some quality annexed to a real estate, by virtue of which it may be defeated, enlarged or *created* upon an uncertain event." *Bacon's Ab. Title Condition.*

What says my Lord Coke? *Modus et conventio vincunt legem:* " The form of agreement and the convention of the parties overrule the law." 2 *Coke,* 73. Again, he says: *Cujus est dare ejus est disponere:* " The bestower of a gift has a right to regulate its disposal. The bargainer of an estate, for instance, may annex such *condition* as he *pleases* to the estate

bargained—*for the land moves from him*—provided, however, that the conditions are not illegal, repugnant, or impossible." 1 *Vol. New Library of Law and Equity*, (top paging) 154.

"A court of equity, cannot control the lawful contracts of the parties, or the law of the land." 4 *Kent's Com.* 131.

The deed in question not being a mortgage, are there any facts alleged and proved, going to show that a mortgage only was intended by the parties, and that *through fraud, accident or mistake*, the deed executed does not exhibit the true agreement and understanding of the parties? There is no such pretence, either in the bill or the proofs. On the contrary, it is expressly averred in the bill, that the deed in question was made in its present form and shape, in strict accordance with all the prior understandings, and express agreements of the parties. No fraud, accident or mistake is pretended or that the parties designed or expected any other conveyance than the exact deed executed.

When the deed fails to express the true agreement of the parties, through fraud, accident or mistake, then, and then only, can parol proof be introduced to contradict the written instrument; and this can only be done on a bill brought to reform the deed. 6 *Barb.* 98; 10 *Barb.* 582; 5 *Barb.* 63, *and authorities cited.*

Such parol understandings are void by the statute of frauds.

The remedy of the party has been lost by delay, if he ever had any. 2 *Edwards Ch. R.* 78; 4 *Barb. Ch. R.* 359.

*Lynde*, in reply. The foundation of the argument of the defendant's counsel is, that the condition of the deed is a condition precedent. But the estate conveyed by this instrument vested with the delivery of the deed. This is a condition subsequent. The estate would not be enlarged upon the payment of the money. There can no instance be found in the forms of conveyance, where a condition precedent is followed by the phrase " cease, determine and be of no effect."

There is no loss of remedy in this case by delay. The interest of the money is full and adequate legal compensation for the non-payment. *Flagg vs. Mann,* 2 *Sumner,* 538.

The taking of the bond was a payment of the money, taking a note would not be. 2 *Vern.* 54 ; 2 *Mass.* 403 ; *Flagg vs. Mann,* 14 *Pick.* 467.

As to the right of a party, in a court of equity, to show by parol, that a deed absolute on its face is a mortgage in fact. *See Law Rep. Aug.* 1853, 334 ; *Hodges vs. M. & F. Ins. Co.,* 12 *How.* 139 ; *Russell vs. Southard,* and the cases heretofore cited.

The very use of an absolute deed intended as a mortgage, to defeat the character intended, is in law and equity *a fraud.* 2 *Sum.* 232 ; 9 *Dana,* 109 ; *J. J. Marshall,* 355 ; 17 *Pet.* (*Morris vs. Nixon,*) *Getman vs. Getman,* 1 *Barb.*

*By the Court,* SMITH, J. [The Chief Justice and Mr. Justice Crawford having been concerned in some way as counsel, in some former stage of litigation upon the subject matter of the suit, a stipulation was entered into between the counsel for the respective parties, to have the case heard before Mr. Justice Smith, and by him decided, which was accordingly done.]

I shall first examine this case, in the light of the written contracts between the parties, and of the matters established by the bill and answer., without reference to the proof taken ; and first:

What are the rights of the parties, derived from the bond of Rogan to Walker, and Walker's deed to Rogan?

It is contended on the part of the complainant, that the deed, on its face, is in its legal effect, a mortgage, and under it the complainant has a right to redeem. But if not, the parol proof submitted by him, shows the original transaction to have been a loan of money, and that the deed and bond were executed in the manner and form they were, to secure the payment of the sum loaned, and interest.

On the contrary, it is insisted by the defendant, Walker, by his counsel, that the deed is not by its terms, its legal effect, or in consequence of any of the facts or circumstances recited therein, in law a mortgage ; that it does not show on its face to have been executed, with the bond recited, to secure the payment of a loan of money and interest, but that it is a deed with a condition *precedent* ; that by its effect no estate passed until the performance of the condition in full ; that this condition must be punctually and literally performed by the grantee before any estate could, by its terms, vest ; and that parol proof is inadmissible to prove any facts or circumstances which would vary the terms of legal effect or control the operation of the deed.

That this deed is a strictly technical mortgage, I apprehend no one will contend. It wants many of the essential elements of a mortgage. Who is the mortgager? Not Rogan, for he makes no deed, passing an estate to Walker. Not Walker, for he is placed by

JUNE TERM, 1853.

Rogan
vs.
Walker et al.

the bill in the character of mortgagee, and it is against him as a mortgagee, wrongfully denying the equitable rights of the mortgagor to redeem, that the bill addresses itself to the consideration of the court. Nor does it present itself like those cases in which the owner of an estate, to secure a loan of money, makes to the loanor an absolute conveyance of his estate, to secure the payment of the loan ; for by the terms of the deed and bond recited, no estate is shown to have passed from Rogan to Walker. Walker is not strictly a mortgagee, for no estate has passed to him from Rogan. Rogan is not a mortgagor, for he has parted with no estate upon condition, which he has evidenced by deed.

It is not, however, indispensable to apply an approved technical term to an instrument or transaction, in order to perceive and administer the equities which it may disclose. Nor should it be demanded, that all the various transactions and forms of agreement, to which modern improvement and advanced civilization and progress have given rise, should be reduced within the scope of nomenclature, adopted in the early stages of legal science. Nor is it wonderful that in the pursuit of substance, names have been left in the rear. It is sufficient that the established principles of equitable jurisprudence are found competent to the substantial and equal administration of justice. According to such principles, we shall preceed to examine the deed in question, and to give to it its proper construction and legal effect.

" An estate upon *condition*" says *Blackstone, 2 Com.* 153 ; "is one whose existence depends upon the happening of some uncertain event, whereby the estate

may be either *originally created or enlarged, or finally defeated.*"

Again, page 154 : "An estate on condition expressed in the grant itself, is where an estate is granted, either in *fee simple* or otherwise, with an express qualification annexed, whereby the estate granted shall either commence, be enlarged, or be defeated, upon performance or breach of such qualification or condition. These conditions are therefore either *precedent* or *subsequent*. *Precedent*, are such as must happen or be performed before the estate can vest or be enlarged ; *subsequent* are such, by the failure or non-performance of which an estate already vested may be defeated. Thus, if an estate for life be limited to A. upon his marriage with B., the marriage is a precedent condition, and until that happens, no estate is vested in A. Or, if a man grant to his lessee for years, that upon the payment of a hundred marks within the term he shall have the fee, this also is a condition precedent, and the fee simple passeth not till the hundred marks be paid. But, if a man grant an estate in fee simple, reserving to himself and his heirs a certain rent ; and that if such rent be not paid at the times limited, it shall be lawful for him and his heirs to re-enter and avoid the estate ; in this case, the grantee and his heirs have an estate upon condition subsequent, which is defeasible if the condition be not strictly performed."

Kent, in his Commentaries, vol. 4, page 125, says : "These conditions are also either precedent or subsequent, and, as there are no technical words to distinguish them, it follows, that whether they be the one or the other, is matter of construction, and depends upon the intention of the party creating the estate.

A precedent condition is one which must take place before the estate can vest, or be enlarged; as, if a lease be made to B. for a year, to commence from the first day of May thereafter, upon condition that B. paid a certain sum of money within the time; or, if an estate for life be limited to A. upon his marriage with B.: here, the payment of the money in the one case, and the marriage in the other, are precedent conditions, and until the condition be performed, the estate cannot be claimed or vest. Precedent conditions must be literally performed; and even a court of chancery will never vest an estate, when, by reason of a condition precedent, it will not vest in law."

Again, page 125, the same author says: "Subsequent conditions are those which operate upon estates already vested, and render them liable to be defeated. Of this kind are most of the estates upon condition in law, and which are liable to be defeated on breach of the condition, or on failure of payment of the rent, or performance of other services annexed to the estate. So long as these estates upon subsequent condition continue unbroken, they remain in the same situation as if no qualification had been annexed." See also *Wood's Inst.* 142.

" Conditions in deed may be subdivided into conditions *precedent*, which must be performed before the estate can take effect, and conditions subsequent to the estate, or to be executed after it." *Wood's Iust.* 235.

" Conditions precedent are such as must be punctually performed before the estate can vest; but on a condition subsequent, the estate is immediately executed; yet the continuance of such estate dependeth on the breach or performance of the condition." 1 *Bacon's Abr.* 640.

With these lights before us, we are prepared to enter upon the examination of the deed of Walker to James Rogan. It is conceded that no precise words are essential to determine the character of a condition expressed in the deed, whether the same be precedent or subsequent, but that its character depends upon the construction of the whole instrument.

It is also certain that this is a conditional deed. But the important question to be settled is, whether the condition expressed in the deed be precedent or subsuquent, for chancery may relieve against the latter, but perhaps not against the former. The language of the deed is as follows: " This indenture made this 27th day of February, A. D., 1839, between Martin O. Walker, of the city of Troy, in the State of New York, party of the first part, and James Rogan, of &c., of the second part; witnesseth, that the said party of the first part, *for and in consideration of the conditions of a certain bond, hereinafter named,* and of one dollar in hand paid by the said party of the second part &c., hath granted, bargained, sold, and by these presents, *do grant, bargain, sell and confirm,* unto the said party of the second party, his heirs and assigns, all those certain pieces or parcels of land, &c., together with all and singular, the appurtenances thereunto belonging, and all the estate, right, title, interest, claim or demand, whatsoever, of the said party of the first part, either in law or equity, of, in, and to the above bargained premises; to have and to hold the said premises above described, with the appurtenances unto the said party of the second part, and his heirs and assigns," * * here follow covenants for quiet enjoyment, &c., " against all and every person or persons lawfully claiming or to claim the whole or

any part thereof, by, through or under the said party of the first part, will warrant and defend. Conditioned and provided, always, anything herein contained to the contrary notwithstanding, that if the said party of the second part shall fail to comply with the conditions, or any part thereof, of a certain bond, bearing even date with these presents, and hereinafter described, then this conveyance, and the estate hereby created, shall cease, determine, and be of no effect. And the said party of the first part, or his legal representatives, shall have the right to re-enter and take possession of said premises, and to sell and convey the same to any other person or persons, and to keep and retain all moneys paid herein, without recourse either in law or equity ; which said bond is in the words and figures following," &c., &c.

This is the whole of the substance of the deed and the conditions annexed.

In the argument, it seemed to have been assumed by the counsel for the defendant, that the condition expressed in this deed is a condition precedent, and that no estate vested until the performance of the conditions recited in the bond named ; which conditions are, to pay Walker and Baker $829.58 on the 18th day of February, A. D. 1843, and to pay annually $29.04 as interest on said sum, to pay all taxes, assessments or impositions that might be legally imposed on the premises, and to save him and them harmless. But if such was the intention of the party in making the deed, he was certainly very unfortunate in his selection of terms, by which such intention was sought to be expressed. The words of grant are full and ample, and are nowhere in the deed limited, or sought to be limited in their effective force, or postponed to,

JUNE TERM, 1853.

Rogan
vs.
Walker et al.

or made dependant *upon*, the performance of any condition whatsoever. They follow immediately the expression of the consideration, which is the bond of the complainant and one dollar paid by him. The grant of the one party was the equivalent for the bond of the other. The estate conveyed was the consideration of the bond, and the bond delivered was the consideration for the grant of the estate. Walker held the complainant's bond, which he could enforce in law, and the complainant held Walker's deed, which he could make absolute by performing the conditions of his bond.

It is true that when a condition precedent is expressed in the deed, no estate can vest until the condition be performed. But in all deeds containing a condition precedent, it is expressly declared, that the grant is *upon* such a condition, or the estate is to be enlarged upon the happening of the event. As in the case put in Blackstone, " If a man grant to his lessee for years, that *upon* the payment of 100 marks within the term he shall have the fee." Here the existing state, for years is to be enlarged to the fee, by the performance of a precedent condition, within the term ; very different from the case where, if a man grant to A. the fee simple of an estate, which should cease and determine at the end of a term of years, in case A. should fail to pay the 100 marks within the term. In the one case an estate is to be enlarged upon the performance of a condition, in the other the estate is to be defeated upon failure to perform the condition, or, in other words, in the one case the condition is precedent, and in the other it is subsequent. But in the deed before us, the defendant does not grant and confirm the premises unto the complainant *upon* the performance of the condi-

tions named in the bond of the latter. He no where intimates his intention to hold the estate in himself until the performance of the bond. On the contrary, he expressly declares, that upon the failure of the complainant to perform the conditions, the estate thereby created should *"cease, determine and be of no effect.* It was not the performance of the condition which should vest the estate, but it was the failure to perform the condition which should cause the estate already by the deed vested, to cease and determine. The words " the estate hereby created shall cease, determine, and be of no effect," are too significant to be overlooked in ascertaining the proper construction of this deed. If no estate was intended to be vested until the performance of the bond, why not say so, or use words expressive of such idea? why say, that upon failure to perform, the " estate thereby created shall cease." An estate must begin to run before it can cease. There can be no determination to an estate which never had a beginning. Yet the condition here is, that upon failure to perform, the estate shall cease, not that upon performance the estate shall vest; that upon breach of condition the estate shall determine, not that upon compliance with the condition it shall commence; that upon failure of performance the conveyance and the estate thereby *created* should be of no effect, not that upon performance the conveyance and the estate thereby created should take effect.

But again, the deed further provides that if the party of the second part failed to comply with the conditions of his bond, the party of the first part should have the right to *re-enter* and take possession, &c. This provision certainly implies an estate accom-

panied with possession. Until failure of the grantee, there is no right reserved to the grantor. Until condition broken, there is no right to enter. The reservation of the right to re-enter upon breach of condition, implies the previous investiture of the grantee, and the divestiture of the grantor. Until the failure of the grantee to comply, his dominion was complete. The grantor had no right of entry, no estate to convey or to claim; it was all in the complainant; to cease and determine, it is true, upon breach of condition; but, until that event, it was in him entire and absolute, subject only, not to be vested upon performance, but to be divested or defeated upon non-performance. The right to re-enter, is by no means a novel reservation, accompanying a grant expressed in the deed. This, and the like, are the usual accompaniments of conditions subsequent. Their applicability to conditions precedent would be novel, if not absurd; for, as no estate vests until the performance of the condition, and as, upon performance, the estate becomes absolute, the reservation of the right to re-enter in case of breach would be without reason. But in regard to conditions subsequent, such reservation is proper, for it implies the right of the grantor to resume that with which he has before parted—to re-invest himself of that of which he had before been divested. And for this we have the authority of the books. "But if a man grants an estate in fee simple, reserving to himself and his heirs a certain rent, and that, if such rent be not paid at the time limited, it shall be lawful for him and his heirs to re-enter and avoid the estate; in this case, the grantee and his heirs have an estate upon a condition subsequent, which is defeasible if the condition be not strictly performed." 2 *Black. Com.*

155 ; *Bacon's Abr. Title Condition; Wood's Inst.; Coke's Littleton.*

Again, the very words of the grant indicate the intention of the grantor to pass the estate on delivery The party of the first part "hath granted, bargained and sold; and by these presents does grant, bargain, sell and confirm unto the said party of the second part." These words, unless modified and restricted by the inevitable force of other words following, create an estate *in presenti*, and the following modifying words must be construed so as to support the estate, unless they are repugnant to such idea. The terms of the condition in this deed are not only not repugnant to, but, it would seem, were selected for their harmony, with the idea of the creation of a present estate ; for in case of failure to comply with the conditions of the bond, "*the estate hereby created*" (that is, the estate now made and passed to the grantee) "shall *cease, determine, and be of no effect.*" This language is wholly irreconcileable with the idea contended for by the counsel for the defendant, that, until performance, no estate could or should be created, for then the words "cease and determine" would be without meaning.

"A testator gave a large amount of lands to his wife" for life, and all her real estate at her death to A., on condition of his marrying a daughter of B. and C., who, at the making of the will, had no child. Held the making of the gift being *in presenti,* "I give," &c., imported an immediate interest. "it would have been otherwise, it seems, if the devise had been, 'I devise my land to A. *on his marrying B.*'" *Finley vs. King,* 9 *Pet.* 374; *Taylor vs. Mason,* 9 *Wheat.* 325. Conveyance in fee, reserving a life estate in part of the land, "this deed to take effect on the following condi-

tions," viz : payment of money at divers times to sev-

eral persons. The fee passes on conditions subsequent. *Howard vs. Turner*, 6 *Greenl.* 106.

Enough has been said, it is believed, to satisfy every one that the condition expressed in this deed is a condition subsequent. That an estate vested *in presenti*, and breach of condition was to defeat the estate, and not that performance was to vest it.

But there are other considerations which present themselves upon the full examination of all the circumstances referred to and expressed in the deed. Had it been the intention of the party grantor, to make and execute a simple deed, with a condition precedent to the vesting or creating an estate, that intention would have been fulfilled by the expression of the condition, and that the estate was to vest upon the performance. If the intention was to hold the fee in himself, and not to part with it, except upon compliance with the conditions by the grantee, it would have been quite sufficient to have made such a deed, and to have stopped there. But there is more of the transaction than this. It was not enough to affix to his deed a condition for the payment of money, leaving it optional with the grantee to fulfil the condition or not ; but the grantor goes further, and takes a penal bond from the grantee, by which the latter is bound to the performance of the condition at all events ; thus showing that the grantor himself did not choose to rest the transaction upon a mere condition in his deed, by which the estate might either vest or be defeated, but that he chose rather to pass the estate with a condition of defeasance, and to superadd the personal obligation of the grantee.

It is impossible not to regard the bond recited as a

June Term, 1853.

Rogan
vs.
Walker et al. prominent, if not a distinguishing feature of the instrument under consideration. It formed, in fact, the sole consideration of the deed. It was made in view of the deed to be executed. It arose directly out of the land mentioned in the deed, as is evident from the matters recited in the conditions of the bond, among which were, to pay all taxes and assessments imposed upon the premises, and to save *them* harmless, &c. The bond being for the payment of a certain sum of money and interest, and for the payment of the taxes that might be assessed upon the land, and the deed being in consideration of the bond, can any one doubt, looking to the evidence presented by the deed and bond only, that the bond was given for the payment of the purchase money? Can any court of equity, mindful of its obligations, with this deed and its recitations in view, close its understanding to the conclusions which inevitably flow therefrom? Now suppose the deed of Walker to Rogan had recited, as it does, the whole of the bond as it is, stated the bond as its sole consideration, and then had closed with the covenants for quiet enjoyment, &c., without any condition whatsoever annexed. What would then have been the relation of the parties? From the face of the instrument itself, could any one doubt that the bond recited was given for the purchase money? Would not Walker stand in the relation of an equitable mortgagee of the premises? and would any court of equity hesitate to decree his lien upon the premises for his purchase money? And would any court hesitate to decree the cancellation of the bond upon its payment or tender, and discharge the premises from such equitable lien?

The execution and delivery of the bond on the part

of Rogan, and the execution and delivery of the deed in consideration of the bond, on the part of Walker, establishes the mutuality of the transaction between the parties, and, together with the recitals contained in the deed, leaves the real nature of the transaction in little doubt or obscurity.

Without, therefore, looking to the parol proof introduced, but discovering the character of the deed, and trasactions between the parties, from the deed itself and the conditions of the bond recited in it, it is sufficiently apparent, that the bond was for the purchase money for the land, that it was made prior to or at the same time as the deed, that instead of conveying the land by deed absolute, and taking back a mortgage collateral to the bond, Walker inserted in his deed a condition of defeasance on non-compliance with the conditions of the bond.

It is impossible for me, otherwise to construe the deed, and the bond therein recited, and if this construction be correct, equitable relations between the parties are established, and it only remains to ascertain and determine their nature, character and extent

But before proceeding to define the existing equities between the parties, we will endeavor to examine some of the other questions, or points made by the counsel, as bearing materially upon the case, if not to control its determination.

It is contended by the complainant, that " If a conveyance of real estate be made as security, whatever be the form, equity will hold it a mortgage," and to this point he cites *Flagg vs. Mann*, 2 *Sumner*, 487 ; *Parks vs. Hale*, 2 *Pick.* 211 ; *Barton vs. May*, 3 *Sanford*, 450.

This proposition is admitted on the part of the defendant.

It will be recollected, that hitherto we have considered this case solely upon the proofs furnished by the deed and the bond recited therein. We shall continue to do so for the present, not intending, however, to evade the points made by the counsel in relation to the admissibility and effect of the parol proof taken in the case, but, designing to test this instrument, by the rules of equity jurisprudence, without aid from collateral proofs or circumstances. Hence we have not sought to inquire after the source of Walker's title. We have not sought to find out what pre-existing title or equities, if any, Rogan may have had in the land. It will hereafter be proper to do so, but not now.

Is there, then, a conveyance here made by any body, or in any form as a security?

To answer this question, let us look again to the evidence furnished by the deed of Walker to Rogan. Was there an indebtedness by Rogan to Walker? This is evidenced by his bond to Walker. Now if Rogan had conveyed this or any other land to Walker to secure the payment of the bond, such conveyance, whatever may have been its form, equity would hold it a mortgage. But Rogan makes no conveyance. Yet here is a conveyance made by Walker to Rogan. If the indebtedness evidenced by the bond had subsisted independent of any other transaction between the parties, than one having reference to the land, Walker would not have made a conveyance of the land to Rogan to be absolute upon its payment. The bond was evidently the sole consideration of the conveyance. If A. owes me $500, I certainly will not

convey to him my farm in consideration of his paying

me. But if I deed him my farm in consideration of his paying me a certain sum of money, the sum of money is the purchase price. If I deed him my farm in consideration of his bond, which I take for the payment of the same sum of money, it is equally a sale on my part and a purchase on the part of A. But if, instead of deeding absolutely to A. on his execution and delivery of his bond for the purchase money, I insert in my deed a condition, that in case he does not pay his bond, the estate conveyed shall cease and determine, my motive in making the condition is apparent. If A. had paid me the purchase money at the execution or delivery of the deed, no condition would have been inserted. But as he paid me his bond instead of the money, I inserted the condition. Why did I do so? To retain or hold in my hand such a claim upon, or interest in the land as shall secure the ultimate payment of the money according to the terms of the bond. If I had given A. an absolute deed, and he had given me back a mortgage to secure the payment of his bond, how would the equitable relations of the parties be altered?

In the one case, the condition of defeasance expressed in my deed would be avoided by the payment of the bond, and in the other, the condition of defeasance expressed in A.'s mortgage would be kept and performed. In both cases, the two grand results aimed at by both parties are accomplished, viz: the payment of the purchase money by A., and the vesting of an absolute estate in him. The equitable relations between the parties are precisely the same in both cases, and the energies of a court of equity are not to be paralyzed by the mere change of forms, nor

its arm shortened by the avoidance of technical terms, or its inability to apply them. This view of the case, it seems to me, exactly illustrates the transaction and relations between the complainant and the defendant, as they are made to appear by the deed and the bond recited in it. It is true, Walker is not a mortgagee, nor is Rogan a mortgagor, in the strict sense of the terms, but we have seen that the equities between them are of the same character as those between mortgagor and mortgagee for the purchase of an estate ; and because a contrivance has been resorted to, for the avowed purpose of defeating and crushing those equities, a court of chancery would be derelict to its most sacred character and functions, if, when applied to for relief, it should allow such a contrivance to succeed. One of the most beneficent heads of its jurisdiction is, to relieve against conditions subsequent ; to support an estate vested, but which is liable to be defeated for want of strict performance of the condition on which it was to be determined. And for this reason, conditions subsequent are not favored in equity, because they go to defeat an estate vested.

Upon the proposition made by the complainant's counsel, and assented to by the counsel for the defendant, it would seem that the equitable relations of the parties are similar in their character to those of a mortgagor and mortgagee, for the purchase money of an estate. It has already been shown that the bond of Rogan was for the purchase money of the land in question ; that Walker was not content to rest the transaction upon a precedent condition, that the deed was not to take effect, or the estate to vest, until the payment of a certain sum of money ; but that he chose rather to bind Rogan, under his hand and seal,

for the payment of the money, with a condition of

defeasance in his deed, in case the bond was not paid or performed ; that the taking of the bond by Walker, and its recital in the deed, give to the transaction a character which perhaps it might not otherwise have had ; and that the giving of the bond on the one hand, and the execution of the deed on the other, established the mutuality of the transaction. It is now apparent, that by the condition of defeasance in the deed, the estate would revest, in law, in Walker, and he would have the right to re-enter, upon the failure to perform the conditions of the bond, the same as upon condition broken in a mortgage. He would also have the right of foreclosure, even without the condition in the deed, as for the purchase money, and the condition could give him no more. If, therefore, the right to re-enter, and to foreclose, or to procure the payment of the bond out of the estate, remained in Walker, what rights remained in Rogan ? Clearly, the correlative right to redeem. If a court of equity would lend its aid to Walker, to foreclose the equity of redemption in case of Rogan's neglect or refusal to comply with his bond, it will equally lend its aid to Rogan to protect and enforce his right of redemption, if applied to within the time, during which such right will be recognized as existing.

The relations of the parties and their respective rights, as hereinbefore stated, result inevitably from the deed and bond recited in it. I have been unable to put any other construction upon it. The view taken of it by the counsel for the defendant, it seems to me, is in direct conflict with the very terms of the instrument, and there is nothing in the transaction as developed by the recitals or languuge of the deed, that

would authorize a different construction than that which the very words imply. The fulfilment of the condition of the bond is not a condition precedent to the vesting of the estate, but the reverse ; the estate is to cease upon their non-fulfilment.

Keeping out of view every impression suggested by the testimony, dehors the deed ; it is to my mind clear, that the condition of defeasance expressed in the deed, the consideration thereof, and especially the taking of the bond, fix the character of the instrument. In *Morris vs. Nixon*, 17 *Peters*, 109, the taking of the bond for the money paid, was held to fix the character of the transaction, and to control the deed, which was absolute on its face. In the case of *Conway's Ex'rs vs. Alexander*, 7 *Cranch*, 218, it was held that the *absence* of any bond or note, or other evidence of debt, was strong evidence to show that none existed, and that the transaction was what it appeared to be, a conditional sale. C. J. Marshall, in delivering the opinion of the court, says : "In this, the form of the deed is not, in itself, conclusive either way. The want of a covenant to repay the money is not complete evidence that a conditional sale was intended, but is a circumstance of no inconsiderable importance. If the vendee must be restrained to his principal and interest, that principal and interest ought to be secure. It is, therefore, a necessary ingredient in a mortgage, that a mortgagee should have a remedy against the person of the debtor. If this remedy really exists, its not being reserved in terms will not affect the case. But it must exist, in order to justify a construction which overrules the express words of the instrument." This language strongly implies, that the taking of a note, bond, or other per-

JUNE TERM, 1853.

Rogan
vs.
Walker et al.

sonal obligation by the vendee, would overrule the express words of the instrument, and raise an equity of redemption; for the bill filed in that case was, a bill to redeem, claiming that the conveyance was to secure a loan of money, and not a sale upon condition.

In the case of *Brown vs. Dewey*, 2 *Barb. S. C. Rep.* 28, was a bill filed by Brown against Dewey, to decree an absolute deed a mortgage, as having been given to secure a loan of money, and also to decree it void on account of usury. Mr. Justice Harris, in delivering the opinion of the court, says : " In form the conveyance is absolute, with an agreement to reconvey upon certain conditions. But if it appears, either from the instrument executed by the parties, or by parol evidence, that the transaction was originally intended as a security for money, no form of words used by the parties in executing their intent, will be allowed in a court of equity to defeat their object." " Although it is true that courts of equity are strongly in favor of the right of redemption, and for this reason, in doubtful cases, contracts of this kind have frequently been construed as mortgages, rather than conditional sales; yet, when the aid of the court is sought, *not to establish a right of redemption*, but to have a conveyance declared a mortgage, for the purpose of avoiding it on the ground of usury, the reason why, in doubtful cases, the court should hold the conveyance to be a mortgage, seems to fail." " It is the right of redemption in favor of which the court leans, not to have the security avoided on the ground of usury." "When the grantor, by virtue of the contract for resale, has the privilege merely of re-purchasing the property upon the terms stipulated, without any obli-

gation on his part to comply with such terms, it has, in some cases, been held to be conclusive evidence that a conditional sale was intended ; while, on the other hand, the fact of there being a right of the grantee to recover the money which he has stipulated to receive, as the condition of a re-conveyance, thus making the obligation between the parties mutual and reciprocal, has sometimes been held to be sufficient ground for treating the transaction as a mortgage." In that case, the sale was held to be conditional, and the decision was placed almost, if not entirely, upon the ground that no bond, note, or other obligation, was given by the complainant to pay the price stipulated in the condition for re-purchase. See also *Holmes vs. Grant*, 8 *Paige*, 243 ; *Glover vs. Payne*, 18 *Wend.* 518, where the want of an obligation for the re-payment of the purchase money, relieved the conveyance from liability to construction as a mortgage, and allowed it to stand as a conditional sale.

So also in *Russell vs. Southard et al.* 12 *Howard*, 142, it seems to have been conceded that if Russell had made any bond or agreement to pay the money, there would have been a clear case for redemption, and the circumstances of such agreement being wanting in that case, it was urged with force, that the case was one of a conditional sale, and not in the nature of a mortgage.

The doctrine established by these cases is by no means new. It springs naturally and necessarily from our first notions of equity. The condition without the bond would be as a proposition to sell, or a refusal of the premises at a stipulated price, within a prescribed time, without any obligation on the part of the complainant to pay the price ; and so the courts have

held that contracts of this kind would not, from the mere face of the instrument, without any evidence showing the intention of the parties to have been different, or without proof of circumstances showing the transaction to have been in fact a loan of money, and the conveyance to have been made as a security, be construed as mortgages. But I have been unable to find a single case, and, from the notions I have of the principles of equity jurisprudence, do not expect to find a single case, where a deed, with a condition of defeasance, in default of payment of the consideration, having been made, and a bond for the payment of such consideration, having been taken, an equity of redemption has been denied, if claimed within proper time.

In 2d *Greenleaf's Cruise*, the learned author, in a note to the text, says, " If a a deed be made, to be absolute on the payment of certain notes, but in default thereof, to be void, it is a mortgage," and he cites *Lincoln & Ken. Bank vs. Drummond*, 5 *Mass.* 321, and *Carr vs. Holbrook*, 1 *Miss.* 240. The report of the former of the cases cited does not sustain the position ; but the latter does, and is strictly in point here. In that case, the complainant Carr had sold to John Holbrook certain lands, for which the latter had given his notes to the amount of $4,000, payable at future times, and Carr conveyed the premises by deed to Holbrook, conditioned to be void on the failure of Holbrook to pay the notes. The notes were not paid, and proceedings were instituted to foreclose, as in case of mortgage. The objection was made to the construction of the deed as a mortgage, and the point distinctly presented to the court, and the deed held to be a mortgage. This opinion of Mr. Greenleaf is also

sustained by the fair import of the authorities heretofore cited, as to the effect of the giving a bond or obligation for the payment of the money on the one hand, and the absence of such obligation on the other.

Did I entertain a doubt that the construction I have given to the deed and bond recited therein, is correct, then according to the well established rules of equity jurisdiction, I should be bound to throw the doubt into the scale, in favor of the equity of redemption. The authorities on this point are conclusive. But I do not entertain the slightest doubt in this respect.

The decision of this case might therefore be rested upon the deed itself, and I need go no further than to inquire, whether the bill filed in this case is so framed as to permit the court to grant the relief asked, and whether the equity of redemption that did subsist, has not been lost by the laches of Rogan, or his grantees. For it does not follow necessarily, that though there may have been an equity of redemption in this case, that such equity is precisely the same in kind, degree and duration, as in the case of a purely technical mortgage. I do not now say that it is, or is not the same.

But other questions have arisen in the argument of this case, and have been discussed with great ability, after profound research. So far as those questions affect this case, I have no disposition to shrink from them.

It is contended by the counsel for the defendant, that the parol evidence taken and submitted in this case, is inadmissible ; that the rights of the parties are to be determined by the written instrument, and that its effect cannot be varied or controlled by parol evi-

dence, unless, upon a bill filed to reform the instru-
ment, and that only in cases where the instrument is
defective, or fails to express the true intent of the par-
ties through fraud, accident or mistake ; and he cites
various authorities, a reference to which will be found
in a former part of the report.

The counsel distinctly claims, that parol evidence of
such kind is only admissible on a bill brought to re-
form the instrument, and the cases cited from Bar-
bour's Supreme Court reports, go far to sustain his
position. But after a critical examination of the opin-
ions delivered in those cases, and with great respect,
I am compelled to withhold my assent to the correct-
ness of the views there expressed. The case in 10
*Barbour*, 583, came before the court upon a motion to
confirm the report of a referee, and for an order to
distribute the monies arising from a sale under a de-
cree of foreclosure. There were various and numer-
ous claimants to the proceeds. One endeavored to
defeat the claim of another, by attempting to show
that the deed of the latter in fee which was the basis
of his claim, was intended as, and was in fact a mort-
gage. The court in that case said, that the parties to
the deed and their privies, were estopped from alleg-
ing that it was not intended as an absolute deed, but
that strangers to the deed were not estopped from
showing by parol the true nature of the transaction
out of which the deed arose. And in the course of
the opinion, it is said that the parties and their priv-
ies, are not permitted to show by parol, the transac-
tion to be different from what the deed imports, un-
less it be, where a bill is filed to reform the instru-
ment, on the ground of accident, fraud or mistake in
its formation.

Whether or not, it was competent, in that case to go into parol proof to ascertain the equitable relations subsisting between each and every of the parties to that proceeding, and their respective grantees of the paper, interest or title therein exhibited, it is not necessary to inquire. That court decided, that in the particular instance before it, it was not competent, and that for all the purposes for which the parties were then before the court, the parties to the deed and their privies were estopped from denying its legal import, and could not introduce parol proof to control it. But when the court went further, and declared that parol proof of the transaction between the parties to such contracts was only admissible on a bill filed to reform the instrument, it is respectfully suggested that it went beyond the purview of the case under adjudication, and to an extent incompatible with well established principles.

It is said that fraud, accident and mistake are peculiar heads of equity jurisprudence, and therefore, a bill filed to reform a deed or contract on such grounds, opens the door to the admission of parol proof of the transactions and intent of the parties. This is true indeed; but is not an equity of redemption as much a subject of equity jurisdiction as fraud, accident or mistake? Where there is a clear equity of redemption in fact, it is difficult to perceive why it may not be shown under a bill to redeem as well as under a bill to reform the deed. The object of the bill to reform the deed is, not to create an equity of redemption, but to establish and perpetuate the evidence of its existence; and, having been proved sufficiently to reform the deed, and that being done, equity will lend its further aid in enforcing the right to redeem

thus established. There can be no reason, why the same evidence may not be admissible in case of a bill to redeem, if the equity is ripe for execution, or in case of a bill to reform the instrument, for the purpose of evidencing the equity. In both cases the equity of redemption is to be first established by proof dehors the deed ; I speak here of cases of bills to redeem, in which the equity of redemption does not appear from the instrument.

In a case where there was really a right to redeem, and that had been omitted to be secured or evidenced in the deed through fraud, accident or mistake, can it be supposed that the holder of that equity must first file a bill to reform his deed, and then file another bill to enforce his right ?

If the party is entitled to redeem at the time of filing his bill, there is no necessity for a reformation of the instrument, but he may proceed at once with his bill to redeem, without seeking to reform, for such a reformation can only be useful in preserving the evidence of the right until the party is in circumstances to claim and enforce it. And, accordingly we find, that in no case where a bill is filed to redeem, the right being claimed, based upon facts and circumstances dehors the deed, is the deed sought to be reformed. But this is only done in those cases in which the right to redeem is remote, or not susceptible of immediate enforcement ; and I have yet to learn the case in which, on a bill to redeem, objection has been taken, that the bill was to redeem and not to reform. When the time for performance has not elapsed, and consequently the right of redemption is still incohate, a bill to reform is the proper remedy. But when the time has elapsed, and the right

37

has accrued, then a bill for redemption is the proper remedy, and in the latter case the circumstances and facts of the original transaction may be proved by parol, not to vary the instrument, but to control it. Or, in other words, to discover whether the circumstances and facts, raise an equity of redemption ; for if they do, that equity is an incident to the transaction itself, not to the deed or instrument. The instrument does not create it. It is the creature of the law, and cannot be destroyed by the contract of the parties to that end. Nor is a Court of Chancery limited to cases of fraud, accident or mistake, in which it can grant relief; (I mean, in the original draught of the instrument.) It is quite clearly stated in several cases, that the attempt to convert into an absolute conveyance, that which was intended to be in the nature of a mortgage, or to set up, as absolute and conclusive, a deed which is conditional and redeemable, is itself, a fraud upon the law, which a court of equity will rebuke and defeat. Besides, undue advantage or inducements to reliance, upon personal confidence, afterwards sought to be taken advantage of, are all grounds for equitable relief in supporting and discovering an equity of redemption, as well as fraud, accident or mistake, in the formation of the instrument. Thus, in *Strong vs. Stewart*, 4 *Johns. Ch. Rep.*, 167, the deed was absolute in its terms, but the proof showed, conclusively, that the consideration was a loan, and the deed a mere security for its repayment, and it was held by the chancellor that as this was the case, equity would attach an equity of redemption to the conveyance, irrespectively of its terms. He says : " On the strength of the authorities, and on the proof of the loan, and of *the fraud*

*on the part of the defendant, in attempting to convert*
*a mortgage into an absolute sale,* I shall decree an
existing right in the plaintiffs to redeem." The bill
in that case, was not to reform the instrument, but to
redeem, and the proof was by parol, not to vary the
deed, but to discover the equity of redemption, if it
existed, which equity might attach to the original
transaction, and which was wholly independent of the
terms used by the parties in expressing their contract.

The fraud spoken of is not connected with the origi-
nal transaction. It is not complained that a clause
giving the right of redemption was omitted to be in-
serted in the deed through fraud, accident or mistake,
or through ignorance, or for purposes of oppression;
but the fraud consisted in afterwards setting up a
deed as absolute, which was given as a security, and
thereby attempting to defeat that right of redemp-
tion which equity would attach to the transaction. It
is the fraudulent use of the deed which equity inter-
poses to detect and prevent, and for this purpose, parol
proof is admissible, not to vary the deed, but to main-
tain the equity which attaches to the transaction in-
herently, and which the deed or contract of the parties
does not create and cannot destroy. If an equity of
redemption really attaches to the transaction itself,
any attempt to defeat that equity, by setting up the
deed as absolute, is fraudulent. To defeat such equity,
the transaction itself must be varied, so that the equi-
ty will not attach. *Maxwell vs. Mountacute, Prac. in
Chancery,* 526; 2 *Atk.* 99, 258; 3 *Atk.* 389; *Powell
on Mort.* 104; *Holbridge vs. Gillespie,* 2 *Johns. Ch.*
29. The very early case of *Newcomb vs. Bonham,* (2
*Vern.* 7) has been followed by courts of equity. In
that case, " a man being seized of lands in fee, makes

an absolute conveyance thereof to the defendant Bon-
ham, but by another deed of the same date, the lands
are made redeemable upon the payment of £1,000
and interest, at any time during the life of the grant-
or ; and in case the lands should not be redeemed
during his life-time, then he covenants that the same
shall never be redeemed.   The grantor dies before the
land is redeemed, and his heir at law exhibits a bill
to have a redemption.   It was, in proof, that the mort-
gagor had a kindness for the mortgagee, being a near
relation, and did intend to give him the lands after
his death, and that the clause of redemption was put
in only on account that the mortgagor was then a
bachelor, and so might marry and have issue; but
that his full intent was, that in case he died without
issue, the mortgagee should have the lands absolutely
without redemption." "The Lord Chancellor said
that it was a general rule, once a mortgage, al-
ways a mortgage ; and in regard to this case, if the es-
tate was expressly redeemable in the mortgagor's life-
time, it must continue so afterwards, and thereupon
decreed an account and redemption."   Here was a bill
to redeem, contrary to the written contract of the par-
ties.   Parol proof was admitted to show the nature
of the original transaction, and the equity of redemp-
tion arising therefrom was made to overrule the stipu-
lations of the parties.   And to this time, there is a
uniform current of authorities, all sustaining the prin-
ciple that an equity of redemption attaches to the
transaction of the parties, and is not created by their
deed ; and on a bill to discover and enforce that equi-
ty, parol proof is admissible, to show what the nature
of the transaction really was.   Nor is this in conflict
with the statute of frauds, any more than with estab-

lished rules of evidence. The interest in the land sought to be established, does not arise out of, nor is it claimed by virtue of any parol agreement between the parties, but results in law from the nature of the transaction. Hence, a clear distinction is to be observed between cases of this kind, and *Lathrop and Hoyt,* 5 *Barb. S. C.,* and *Bander and Snyder,* 7 *Barb. S. C.* In each of those cases, the attempt was to establish an express trust by parol evidence; so that the real points there decided, are not in conflict with the doctrine established by the current of authority before referred to. See also 2 *Vernon,* 520—strongly in point.

It may be fitting that the very recent case of *Russell vs. Southard,* 12 *Howard,* 138, should stand with the ancient case of *Newcomb vs. Bonham.* Both are bills to redeem, and both recognize the equity of redemption as attaching to the transaction and not to the deed of the parties, and both establish the competency of parol proof upon such bills, to show the real nature of the transaction; and the chain of authority from the one to the other is unbroken.

It would seem, that this case of *Russell vs. Southard,* ties the parties down to a conditional sale, so explicitly, that all equity of redemption is cut off, if such were possible to be accomplished by the terms of their contract, and it seems that if it were possible to guard against the admission of parol evidence, to control the contract, it is accomplished here, for the skill of man could not make the stipulations more clear, distinct, and definitive. "The said Russell binds himself, his heirs, &c., that if the said sum and interest be not paid to the said James Southard or his assigns, at the expiration of four months from this date, that

then this agreement shall be at an end and null and void. The agreement of re-sale by the said James Southard to the said Russell, is conditional and without a valuable consideration, and entirely dependent on the payment on or before the expiration of four months from and after the date hereof, of the said sum of $4,929.81 1-2 and interest thereon from this date, as aforesaid ; and this agreement is to be valid and obligatory only upon the said James Southard, *upon the punctual payment thereof of the sum and interest as aforesaid* by the said Gilbert C. Russell," signed by the parties. There is no agreement on the part of Russell to pay the money. The utmost force of language is exhausted to rivet and clinch the rights of the parties to the written contract.

Yet the court say, " It is insisted on behalf of the defendants, that this question (whether the transaction was a mortgage or a deed) is to be determined by inspection of the written paper alone, oral evidence not being admissible to contradict, vary, or add to, their contents. But we have no doubt extraneous evidence is admissible to inform the court of every material fact known to the parties when the deed and memorandum was executed. To insist on what was really a mortgrge, as a sale, is in equity a fraud, which cannot be successfully practised under the shelter of any written papers, however precise and complete they may appear to be." Numerous authorities are cited in support of the doctrine, which it is unnecessary to specify here. They are all to the point, and their current is uninterrupted.

Again : the court says, In respect to the written memorandum, it was clearly intended to manifest a conditional sale. Very uncommon pains were taken

to do this. Indeed, so much anxiety is manifested on

this point, as to make it apparent that the draftsman considered he had a somewhat difficult task to perform. But it is not to be forgotten, that the same language which truly describes a real sale, may also be employed to cut off the right of redemption, in case of a loan on security ; that it is the duty of the court to watch vigilantly these exercises of skill, lest they should be effectual to accomplish what equity forbids, and that in doubtful cases the court leans to the conclusion, that the reality was a mortgage and not a sale."

In the argument of this case, and in the opinion of the court, it seems to have been conceded, that if there had been any bond, note, or agreement, on the part of Russell to pay the money, that fact would have been conclusive of the mortgage character of the instrument. But the question was, whether in the absence of such agreement, and consequently want of mutuality, it could be held a mortgage, and it was held that such want of agreement to pay on the part of the plaintiff, was not conclusive that it was a sale and not a mortgage.

It is indeed true, that there are some cases which might seem to call in question the correctness of the doctrine established by the foregoing decisions. In *Thomas vs. McCormick*, 9 *Dana*, 109, it was held that oral evidence was not admissible in opposition to the legal import of the *deed, and the positive denial in the answer*, unless a foundation for such evidence had been first laid by an allegation, and some proof of fraud or mistake in the execution of the conveyance, *or some vice in the consideration.* But the adjudged cases do not sustain this position, the evidence being equally

admissible, whether there be a denial in the answer or not. And it is difficult to perceive how the denial in the answer can, in the least, affect the principle. If the answer admit the fact, no proof is necessary ; and if the fact is not competent to be proved, it is improper to be alleged, and the defendant is not bound to answer. In 3 *J. J. Marsh, Edrington vs. Harper*, the same court declare " The fact that the real transaction between the parties was a borrowing and lending, will, whenever and however it may appear, show that a deed absolute on its face was intended as a security for money ; and whenever it can be ascertained to be a security for money, it is only a mortgage, however artfully disguised." In *Thomas vs. McCormick*, the court do not say what allegation must be made in the bill to lay a foundation for the evidence, nor what shall constitute such a vice in the consideration as to admit the evidence. In *Russell vs. Southard*, speaking of the case of *Thomas vs. McCormick*, the court say : " But the inquiry still remains, what amounts to an allegation of fraud, or some vice in the consideration ? and it is the doctrine of this court, that when it is alleged and proved that a loan on security was really intended, and the defendant sets up the loan as a payment of the purchase money, and the conveyance as a sale, both fraud and vice in the consideration are sufficiently averred and proved, to require a court of equity to hold the transaction to be a mortgage. No sounder rule of equity administration could be devised. It commends itself alike to the conscience and judgment of every honest mind. *Lathrop vs. Hoyt*, and *Bander vs. Snyder*, in 5 and 7 *Barbour's S. C. Rep.*, are cases where an express trust was attempted to be proved by parol. The court very properly de-

June Term,
1853.

Rogan
vs.
Walker et al.

cided that the statute of frauds was an insurmountable barrier. But in neither of those cases did the question of equity of redemption arise. They were purely cases of express trust, resting in parol, and are not applicable to this case, under the aspect in which we are now viewing it. If the rights of the complainant rested upon the question of trust, a more minute examination of them would be required.

Thus supported by authority, were it necessary to go beyond the deed and the bond recited in it, in order to pronounce upon the rights of these parties, we would be called upon to throw open the door to the extraneous evidence here offered, and adjudicate upon the rights of the parties, in the light of all the facts and circumstances which surrounded the parties at the time, and gave character to the transactions between them. We will do so in this case, for it is a relief to know that the construction we have given to the conveyance, and the equities arising out of it, are in harmony with the clear and manifest intention of the parties at the time, and that the same rights and equities flow from the transaction itself, as result from our construction of their written agreement.

From the evidence, it appears that the lands in question are situated near to the village of Watertown. That the government land sale was expected to come on in the month of November, A. D., 1838, but that it did not, in fact, take place until February, A. D., 1849. That about the year 1836, James Rogan " *claimed*" the lands in question, and so continued to " *claim*" them, up to the time of the government land sale, and that he had made such improvements thereon as to entitle him to the award of the " claim committee" of the lands.

JUNE TERM,
1853.

Rogan
vs.
Walker et al.
To those not familiar with the terms " claim" and " claim committee," used in the evidence in this case, a few words may be proper in explanation.   It is well known to the early settlers of the country, that its settlement and cultivation outstripped the govern ment in its survey and sale of the public lands.   For some three or four years, or more, previous to the government sales, the immigrants to, and settlers in the eastern portion of the Territory, had entered upon tracts of land, of greater or less extent, in most instances erected tenements thereon, intending to pur chase the lands whenever the general government should bring them into market.   Sometimes extensive and costly improvements were made, and sometimes barely sufficient to answer the requirements of the general regulations adopted by the settlers.   These regulations were drawn up by the settlers, and com mittees were appointed in different localities, and for convenient districts, to settle and determine all dis putes in regard to the claims, which might arise.   The claims thus made, were respected by the settlers and citizens generally and held by such title only, until the public sale, when, by common consent, each claimant was permitted to bid off the land claimed by him, and no one was permitted to bid against him, or, what was more commonly the case, some one or more of their number was appointed to bid off all the lands, each tract being bid in the name of the claimant there of.   The general and local governments have rather encouraged this kind of settlement of the public lands, and so strictly have these claims of the settlers been regarded, that immense money and property have been laid out upon them, and they have passed from one to another, by deeds of bargain and sale, without

scarcely an infringement upon the right thus acknow- June Term, 1853.
ledged.

Rogan
vs.
Walker et al;

It appears, therefore, that James Rogan had such a claim to the land now in controversy, and that his claim, as well as all the lands in that precinct was bid off, by one John Richards, who was appointed by the settlers for that purpose. James Rogan's claim was bid off by Richards in the name of Martin O. Walker.

It further appears, from the evidence, that Walker came to the Territory some time previous to the land sale in 1839. That he then made known his business to be, to buy the lands for the settlers. He said that he had money for that purpose. He stated that he required his money doubled in four years, and seven per cent. interest per annum. He requested several persons to send him customers from among the settlers at that rate. He declared, that he did not wish to buy unimproved lands, such as would be likely to be deserted and left on his hands. He said there was land enough unoccupied, that he could purchase, if he wished to buy land for the sake of the land, that it was the interest that he wished to make on his money, and that he was not after the land. He stated at the Finch's that his terms were to double his money in four years, with seven per cent. interest, that he was to take the title to the lands in his own name, as security for his money and interest. These facts are testified to by two witnesses. Mr. Dennis saw Walker at the land sale, when he informed Dennis that his business was to loan money to the settlers, or rather that he entered land for them, giving them a term of years to pay the money back. That he had a large amount of money to invest in that way. In addition

to this evidence, so direct, and borne by so many witnesses, there is the. written memorandum marked A., made in Nov. 1838, between Walker and Rogan, similar in substance to the agreement actually made in February following. The fact that he bought land for other settlers on the same terms, the fact that he does not appear to have entered any government lands whatever, except such as were more or less improved, and all claimed by settlers. The fact that he said that he did not wish to buy for the sake of the land, but that it was the interest of the money he desired to secure, together with the circumstance of the recitation of the bond in his deed, the amount in its condition being just double the purchase money, the amount to be paid in interest corresponding with the terms of the agreement alleged, and the four years terms of payment; all these facts and circumstances, exhibit that allegation, in the defendant's answer, " that he did purchase the said lands with the intention of acquiring and holding them until he could sell the said lands at a reasonable profit," so palpably, and so shockingly untrue as to leave little more to be said of any part of the answer.

From this evidence, it seems to me, that no one can doubt, as to the real nature of the original transaction. That Walker's intention was to invest his money, by advancing to or for, it matters not which, the settlers upon improved public lands, money to purchase their respective claims, at a rate of interest which should double the principal sum in four years, with seven per cent per annum, in addition, and take the title to the lands in his own name, as security, there can be no manner of doubt. He distinctly declares to Finch that that is his object. He repudiates the

idea of buying land for the sake of the land, or for

the profit he might make by its future enhanced value, but it was the repayment of his money and interest he wanted. He discards unsettled, unimproved lands, because they might be left on his hands. He desired others to send him customers, with whom he might agree to advance the purchase money on his proposed terms. If, as he says in his answer, he attended the land sale at Milwaukee, to purchase lands merely, why seek for customers? The government was all the customer necessary to such end. But it is idle to reason in support of a position so apparent from every feature and circumstance connected with the whole series of transactions.

But it is said that James Rogan had no interest or estate in the land, prior to its sale; that he had nothing to convey to Walker, and hence he could not stand in the relation of a mortgagor. Perhaps not. Technically speaking, certainly not. But is it true, that James Rogan had no interest in the land prior to government sale? Are we prepared to say that the possession, and improvements, of advance pioneer settlers on the public lands, shall be altogether alien to our jurisdiction? So long as these claims are encouraged by the general government, and so long as settlement and occupation continues to outstrip survey and sale, it would seem that the good order and peace of society requires, that the arm of the law be not altogether withdrawn from their protection. Be that as it may, Walker in this case did recognize, in February, 1839, and in November, 1838, some interest of Rogan in these tracts of lands. He recognized also the "claims" of other settlers. His proposition was to buy *their* lands for them, "*if he were permitted*" to

do so. How came Walker to be permitted to buy these claims? Or, rather, (for he did not buy them) how came they to be bid off in the name of Walker? John Richards was appointed by the settlers, of whom Rogan was one, to bid off all the lands in that precinct. Is it to be believed, that that agent of the settlers would have bid off these lands in the name of Martin O. Walker, without some agreement by which the consent of Rogan was obtained? Was not such consent absolutely necessary to Walker's acquisition of the title? If the interest of Rogan was not, as indeed it was not, a legal interest, yet it was such as Walker desired to render available for his purposes, such as, under the circumstances was necessary to him, such as he did recognize, obtain and profit by, and such as entered into and became an important element in the whole transaction, and such as constitutes an important element in the equities arising out of the transaction.

If Walker had set up in his answer, an illegal and unjust combination, by which he was prevented from free bidding at the sale, the case might have been different. But it was that very community of interest which Walker sought to render available to his own purposes. It was the claims of the settlers which he sought out, as an investment affording ample security and a large return by way of interest or usury for the money advanced for them by him, and, as if to mark indelibly the character of the transaction, as a monied one, as an advance, or loan of money for a given purpose, the bond for the repayment of the money is made the initiatory contract, and the consideration of the deed.

June Term, 1853,

Rogan
vs.
Walker et al.

There is still another view of this case which I am compelled, by the course of the argument, to take.

It is objected to the matters recited in the bill, and the evidence offered to sustain them, that it " is an attempt to establish a resulting trust by parol, contrary to the statutes of the Territory in force at the time." *Statutes of Territory,* 1839, 162, § 6 ; 164, § 2.

The Revised Statutes of the Territory did not prohibit resulting trusts, or trusts by implication of law, but did prohibit the creating of any trusts in lands or real estate, except by writing, signed by the parties or their lawful agents, or by operation of law.

Express trusts, or such as are created by agreement of the parties, must be in writing, and parol proof is inadmissible to establish them ; but trusts which result from operation of law do not require to be in writing, and parol proof is competent to establish the facts and circumstances out of which they arise.

The case of *Getman vs. Getman,* 1 *Barb. Ch. Rep.* 499, is clearly a case of express trust, attempted to be proved by parol, and the court very properly held to the statute of frauds, and dismissed the bill.

When real estate is purchased with the money of one person, and the title is taken in the name of another, there is a resulting trust in favor of him whose money is paid, and parol proof is competent to show these facts. Authorities need not be cited to sustain this position. The question is fully discussed in *Boyd vs. McLean,* 1 *Johns. Ch. Rep.* 582, and authorities are there numerously cited and ably discussed, and the principje fully settled.

But the case of *Boyd vs. McLean* establishes another doctrine in relation to trusts which cannot be disre-

garded, considering this case in the view in which counsel have presented it.

In that case, the title to the premises was not in the plaintiffs. They alleged that they had obtained a loan of the defendant to pay the contract price for the land which had become due; that the land was purchased with the money loaned, the title taken in the name of the defendant, the money, with interest, to be repaid in four years. The loan was explicitly denied by the answer, the want of title or interest of the plaintiff in the lands set up, and the statute of frauds insisted upon. Here was no bond given for repayment of the money, no written conveyance or agreement to convey by the defendants; yet the Chancellor admitted the parol proof to establish the fact of the loan, and held that there was a resulting trust in favor of the plaintiffs.

From this it seems, that if A. borrows money of B. to purchase land, and land is purchased with the money, and the title taken in the name of B. as security for the payment of the money within a given time, there is a resulting trust in B. in favor of A., and that parol proof is admissible to show the fact of the loan. When the money is borrowed by A. it then becomes his, and its investment in lands, it seems, may be followed.

How, then, in view of these authorities, stands the present case? Rogan was in possession of the land by a claim which Walker desired to render available to his own purposes. The time for payment for the land had arrived. Rogan applied to Walker for money to buy the land. Walker did not want the land for the sake of the land, but wanted to invest his money so as to bring him in an annual interest of

seven per cent., and, at the end of four years, double the principal. For some reason, which it is easy to perceive, he takes Rogan's bond for double the amount necessary to purchase the land, payable in four years, with annual interest at three and a half per cent. By consent of both parties, the land is bid off by the agent of the settlers in the name of Walker; the duplicate taken in his name; and thereupon, in consideration of the bond, he deeds the land in fee to Rogan, conditioned that the estate conveyed should cease and determine on failure of Rogan to perform the conditions of his bond. Does any one believe that, but for the consent of Rogan, Walker would have purchased the land? Does any one believe, but for the claim of Rogan, or some one else, to it, he would have desired to purchase it? Does any one believe that, but for the bond of Rogan, either delivered or promised by Rogan, Walker would have invested his money in the land? Would Rogan have given his bond for the money, but for its application to the purchase of the land? Is not the whole transaction clear, that by a common, mutual arrangement, Walker advanced the money to buy the land, took Rogan's bond for its repayment, and held the land as security? If it be not so, I am wholly unable to give character to human action, or to discern human motive. If it be so, then the money was the money of Rogan, and not of Walker, (and no matter whether the bond was actually made or not, at the time of the loan, advance, or purchase;) for Walker could not claim title to both the bond, and the money for which it was given, and the case falls within the doctrine of resulting trusts.

I recollect that it was said that the bill does not set out the loan according to the proof, and that the sum

of the bond is greater than the amount of money paid for the land ; and hence it could not have been for the loan of the purchase money.    But it is quite evident how and why the amount of the bond became double the actual sum loaned, and the interest stated at three and a half per cent.    And it is sufficient answer to the objection to say, that a mere trick or device to avoid the consequences of usury, must not be permitted to prevail as a technical objection against substantial equity.    I think the bill sufficiently states the loan, and, indeed, the whole transaction, and that the proof is in conformity with the allegations of the bill.

And here let me remark that this case differs in its essential characteristics from those cited from Barbour, inasmuch that the trust here established is a resulting trust, arising by operation of law, and in those the attempt was to set up an express trust, arising from the agreement of the parties resting altogether in parol.    In neither of those cases, was a bond or obligation taken for the money, nor was there any written conveyance or contract for a conveyance to the complainant.    See the cases of *Hoyt & Lathrop vs. Bundel & Snyder*, before cited.

But although under the proofs this case might be sustained on the ground of a resulting trust, I prefer to place it where the parties themselves placed it by their written agreements, and the equity of redemption arising out of the transaction which gave rise to that equity which we have found to be, paramount to their contracts and agreements.

Though an equity of redemption did arise here out of the transactions of the parties, similar in kind to

that in case of a common mortgage, yet it does not
follow that such equity is the same in extent and du-
ration. Here is the chief difficulty I have found in
the case. Though equity will not hold the party to
payment at the very day and hour, yet how long may
payment, upon contracts of this kind be delayed, with-
out being extinguished by lapse of time, or the laches
of the party?

In the case of a common mortgage, the equity of
redemption continues, as a general rule twenty years,
unless sooner foreclosed. In an early case, a bill to
redeem was dismissed as stale, 17 years having elaps-
ed, and no claim to any right to redemption having
been set up or intimated, though the parties had been
in a situation to assert their right all the while. We
might find analogies perhaps, in cases of bills brought
for specific performance, but in this case it is not deem-
ed necessary to do so.

The rule in equity is to relieve against conditions
subsequent, whenever compensation can be made.
It is a general rule in equity that interest is a com-
pensation, when the payment of money only is the
condition to be performed. But though this latter
rule does not so perfectly accord with our notions of
equal and exact justice, we are relieved here, by the
motive of the defendant, apparent as well from the
written instruments as from other proof in the case,
which indubitably was, to secure to himself the re-
payment of his money and interest at a rate of more
than 25 per cent. per annum. Such he declared to
be his object at or about the time, stating that he did
not want to purchase land for the sake of the lands,
but it was his money and interest only that he wanted

to secure, and wished to buy no lands, but such as were improved, and not likely to be deserted and left on his hands. If, therefore, his money is repaid to him, and interest, and he is relieved from having the land deserted and left upon his hands, full compensation is given him according to his own notions of compensation at the time of the transaction, and full equity will be administered. Besides, the complainant alleges, that since the bond became due, and the failure of James Rogan to pay it, he has been ready and willing to pay so much as may be equitably chargeable upon that portion of the lands claimed by him, and the defendant makes no complaint on the ground of lapse of time, but insists upon a complete forfeiture of the estate, because of the want of strict compliance with the condition of the deed.

The bond became due in February, 1843. Walker instituted an action of ejectment to recover possession in 1847, and in 1849 this bill was filed. Under all the circumstances of the case, and in view of the rights claimed and attempted to be enforced, I am of the opinion that the bill was filed in time, and that the equity of redemption did not cease either by lapse of time or the laches of the parties.

The question of usury is not raised in the case, and therefore nothing is said about it.

I have commented but little upon the answer of the defendant, because, in all material respects, it is overborne by the proof, and because it is unpleasant to remark upon it as perhaps it deserves.

I should not discharge my whole duty in this case, did I fail to acknowledge the aid I have had from the surpassing ability and research which have been

brought to its discussion by the learned counsel employed in the argument.

The complainant is entitled to the relief sought by his bill, and it will be decreed accordingly.