JOHN O. MATTHEWS, APPELLANT, vs. WILLIAM F. PORTER, APPELLEE.

A deed to land is in the name of, and recites a consideration from B, A., who is not the grantor in the deed, seeks, by parol testimony, to establish that the consideration for the land was money which B. had loaned him, and that the deed was a security for this debt.  In such a case, where there is a positive denial in the answer, the clearest and strongest testimony must be produced to establish the loan.

Appeal from the Circuit Court for Duval county.

The statement which follows was made by the Justice who delivered the opinion.

This is an appeal from a final decree of the Circuit Court of the 4th Judicial Circuit for Duval county.  John O. Matthews brought his bill against William F. Porter, alleging that in 1869 he effected a loan of nineteen hundred and forty-four ($1944) dollars from Porter for the purpose of

paying for a tract of land in Marion county, which had been purchased by him of Charles C. Byrne; that to secure Porter in the repayment of the money so borrowed, with the interest agreed to be paid, the parties entered into an agreement in writing, which is in the custody of Porter, and which, if inspected by the court, will exhibit the state of facts stated ; that he directed the said Byrne to execute a deed for said land directly to said Porter, for the purpose of securing him in the repayment of his money ; that under the agreement and arrangement mentioned, and after the purchase of the land, and after the deed had been made and executed, he, Matthews, entered upon the land under the agreement, and by improvements greatly enhanced its value ; that its value was increased from four to ten dollars per acre, amounting in the aggregate to about three thousand dollars ($3,000) above the original cost, all of which was done with the full understanding with Porter that it was to enure to the benefit of complainant, and that it was understood by the parties that if the amount which was loaned was not repaid as agreed upon, then the defendant was to sell the land and reimburse himself for the money loaned and interest, the surplus to be paid to compainant; that complainant was unable to pay the money as agreed, and that defendant, without any proceedings either at law or equity, sold the land to James A. Harris for the sum of five thousand dollars, ($5,000) and executed a deed therefor. The plaintiff then claims that under the statute law of the State relating to mortgages, Porter holds the amount received from the sale over and above the sum due by him, principal and interest, in trust for his use and benefit. Plaintiff prays a decree for the amount realized by defendant from this sale over and above the sum which he owed the defendant.

The defendant answers : That the plaintiff did in the year 1869 apply to him for a loan of nineteen hundred and forty-

four dollars, ($1944) but that it is not true that he ever effected such loan to pay for the land described in the bill. He denies that plaintiff ever at any time entered into a written agreement with him to secure the payment of said sum, or that he ever loaned him that sum. The defendant then alleges that the transaction which occurred was this : that in March, A. D. 1869, defendant entered into a written agreement with the said John O. Matthews, in which he agreed to sell to him certain lands therein described, and to convey said land to plaintiff by good deed, provided plaintiff should pay for the said land, the purchase-money in said agreement stated, the sum of twenty-five hundred dollars ($2500) at the time therein stipulated, but that Matthews never at any time paid any part of the purchase-money for said land, nor did he perform any of his covenants ; that Matthews in the year 1869 made application to him for a loan of money with which to purchase said land, proposing to give a mortgage on the land as security ; that defendant positively refused to loan the money, or any part thereof, on such terms. Defendant affirms that he purchased the land through the agency of Matthews as his own land ; that said deed was never intended as a mortgage, nor was there any agreement to so consider it; that it is not true, as alleged in said bill, that said Matthews directed and allowed the said Byrne to make the deed for the land for the purpose of securing the defendant in the repayment of the money alleged by Matthews to have been borrowed by him ; that the truth was that plaintiff was acting as defendant's agent, and that for such service defendant paid him the sum of ninety dollars. Defendant admits that after his purchase of the land plaintiff entered upon it under the agreement stated. He denies the charge of increased value by improvement, or that the benefit of any increased value was to enure to plaintiff, except as stated in their agreement, and affirms that plaintiff failed to keep his covenants.

There is in the record an agreement that certain papers should be received without further proof, and that they are the only proof. This agreement plaintiff paid no attention to, nor did the court enforce it, but in view of the conclusion reached upon the other testimony admitted, its effect is immaterial.

The testimony deemed material was as follows:

### Testimony of Matthews.

The plaintiff, the first witness examined, testifies substantially, "that in the year 1869 I concluded a trade with C. C. Byrne for a tract of land on Orange lake, in Marion county, at the rate of $4 per acre, cash, amounting in the aggregate to $1,944; that not having the cash I induced Mr. Porter, of Brighton, Mass., to look at the property; that Mr. P. agreed to advance the money to Mr. Byrne; that the deed should be taken in my name, Porter to take a mortgage from me for the purchase-money; that Mr. P. subsequently declined to advance the money as he had agreed to do; that I then went to Mr. C. L. Robinson & Co., real estate dealers and loan negotiators, and applied to them to introduce me to a gentleman who had money to loan; that Mr. P. introduced the defendant 'as a gentleman who had money to loan;' that I advised Mr. P. of the trade I had made with Byrne; that after describing the property I told Mr. Porter that I would pay two per cent. per month for the money if he would loan it to me; that Mr. P. visited the property, agreed to loan me the money, and let me take the deed to the property from Byrne, and that he, Porter, would take a mortgage with interest at the rate of two per cent. per month; that Porter returned to Jacksonville, and that shortly after I went to the same place to consummate the agreement; that Mr. Porter then said he had changed his mind, that he would take the deed in his own name, and would give me an agreement so that my rights would be

protected just as well as if I took the deed. I remonstrated, telling him that he was aware that Dr. Byrne had determined that if the trade was not consummated in a given number of days to break up the negotiation and decline to sell, and that I did not have time then to exhibit the property to any other person, and I would lose the trade; that the defendant replied, 'God knows, Mr. Matthews, all I want is two per cent. for my money, with good security'— he said this with his right had uplifted. He further said he was in doubt as to the effect of homestead laws on a mortgage, and that he would make no loan in that way; that being afraid I would lose the trade I was compelled to submit to his terms; he further stipulating, however, that I was to pay two per cent. per month, the taxes, ten dollars of the twenty due for lawyer's fees for executing title and writing agreement between Mr. Porter and myself, and that I was to let him have at any time within two years 2000 wild orange trees. I think this agreement was reduced to writing. I know an agreement was reduced to writing which embraces all the points already testified to." Then follows a statement as to place of deposit of this agreement, and its history—all of which is immaterial in view of the fact that the agreement was put in evidence by the defendant. That the original amount he agreed to pay Dr. Byrne was $1,944, the sum for which Mr. P. states he agreed to sell the land; "that the interest on this sum at two per cent. per month, with $90 which Mr. Porter advanced me, made up the sum of $2,500." The $90 was paid me by Mr. L'Engle out of a draft of $100, which Mr. P. sent him. "After the deed and contract were made I entered upon the land and employed a party for two seasons cutting off wild orange trees, and advertised the land as for sale by me extensively. In the full of 1871 or spring of 1872, I received a notice from Mr. Porter to quit the premises. I had never resided on the tract. I subsequently demanded the difference between the

price Mr. P. received and the $1,944, with interest at two per cent., which Mr. Porter refused, denying that I had any right to it. The positive agreement between Mr. P. and I was that he was to loan me the money and take the deed as security, he stating that he was afraid of the decision of the courts as to the effect of homestead exemptions upon a mortgage. No other written agreement except the one mentioned was made between us, and the two per cent. per month for one year on $1,944 was added to that sum in the agreement which Porter made to convey the land to me. Porter sold the land for $5000; it was considered a very valuable tract; I did not know of the sale before it was consummated; at the time I made the trade with Byrne I had been in the State about eighteen months; I was to have three years, with the promise that I was to pay a given sum annually, about two per cent. per month; I think the sum was $500. There was an agreement between us on the night before the papers were signed that the defendant should give me a bond for title; when we went to the office of Sanderson & L'Engle (attorneys) the next morning, instead of what I regarded as a bond, the agreement I have testified to was drawn up; I objected to signing it as it was not what was agreed upon, but Porter said the agreement drawn up was just as good to protect my interest as a bond for title would be, and it was what he wanted. At the time the land was sold to Mr. Harris I valued it at $40,000; Geo. R. Hall offered me $50 per acre for a portion of it." Other offers are testified to, but they are not deemed material as they do not relate to the time of the purchase from Byrne.

The testimony brought out upon the cross-examination is immaterial, except that the agreement between the parties which, upon the first page of the opinion of the court, is produced and identified by the witness as the agreement executed by them, and he positively denies any agency for Porter. Some time elapsed between the execution of the

agreement and the execution of the deed by Byrne, as a prior deed was informally executed and returned.

### Testimony of C. L. Robinson.

"I am a real estate broker in Jacksonville; have been so for nine years. I introduced the plaintiff to the defendant. I knew the defendant to be a man of capital, and that he was not disinclined to invest in Florida either in loans or purchases. He was loaning money about that time. As to the transaction in real estate in Marion county, I know the parties had such transaction; all the details I do not know. The transaction was had, or much of the conversation was had, in my office, in regard to what I considered at first to be a loan between the parties. I saw a deed made between Dr. Byrne and defendant. It was not the deed finally delivered, and I left town before the final deed was delivered. Before the delivery of the deed I did understand the transaction was to be a loan, or what was to have the same effect as a loan. I heard several conversations between them in regard to it. The defendant looked at two or three important places with a view of purchasing lands. Some of the conversations I heard occurred after the visit to the lands. All of it that I heard was to the effect that the place was purchased by Mr. Matthews or for his benefit, making it a loan. I think I kept the contract as to this land between the parties in my office for many weeks, but never examined it thoroughly. I don't remember the circumstances under which the contract came into my possession."

The testimony of George R. Hall is simply to the effect that he never made any positive offer for the land to Matthews.

A. S. Baldwin testifies that he was the agent of Dr. Byrne; that he advised Mr. Matthews that unless the money agreed upon, as a cash price, was paid within a certain time the

proposition would be withdrawn.   Dr. Byrne was very impatient.

### Testimony of Porter.

" I did not loan the plaintiff $1,944 to purchase the land in question.   Mr. Matthews spoke to me of this land, and offered to pay my expenses up to it and back if I did not admit that the land was as good as any in the West.   I visited the land, but declined to make a loan for its price unless he would pay $\frac{1}{4}$ or $\frac{1}{2}$ of the purchase money.   I finally made him the proposition that I would buy the land direct from Byrne, pay the amount he was to pay and $100 for his trouble, he to pay one-half the expenses of a proper agreement between us, and he finally accepted that proposition.   He still wanted his chance to buy the land back of me.   We made an agreement which was finally reduced to writing. I never agreed in any shape or form to loan him any money to purchase that land.   The next day after our talk of this agreement we went to the office of Messrs. Sanderson & L'Engle and had the agreement drawn up, and the next day, March 26, I left Jacksonville.   About the middle of April I sent a draft to the order of C. C. Byrne for $1,944. A short time after this I sent a draft for $100, $90 of which was paid Mr. Matthews and $10 paid Mr. L'Engle. The $90 was paid Mr. M. for his services."   He denies making to Matthews the statement as to interest which Mr. M. swears to.   Matthews made no improvements upon the land.   He states that he made no loan in the spring or winter of 1869, except one of $500 to plaintiff.   "I did not think that $2,500 was more than a fair equivalent or profit for me to make for buying the land and holding it a year, he having the privilege to take up and sell wild stumps, as stated in the agreement.   I arrived at this by no particular calculation.   I did not look upon it as any particular rate or per centage.   The tract, including expenses and what I paid plaintiff, cost close up to $2,100.   There was no other agreement than the

one in evidence. Before the agreement was reduced to writing Mr. Matthews wanted the land on better terms to himself, but after the agreement was written, as that contained the only terms upon which I would buy the land, Mr. M. did not object. At the commencement I declined under any circumstances to take a mortgage for the full amount. Plaintiff paid the taxes for one year."

This is substantially all of the testimony of this witness deemed at all material. There is other testimony as to the opinion and advice of counsel in the premises, which is irrelevant and immaterial.

The other facts of the case are stated in the opinion of the court.

*H. Bisbee, Jr.*, for Appellant.

The proposition of appellant is, that a transaction which was really intended as a security for money loaned is in equity a mortgage, no matter how artfully the writings between the parties may have been drawn to make it appear a sale. 1 Hilliard on Mortgages, 69, §1 ; id., 70, 71, 72 ; Russell vs. Southard, 12 How., 139, 148, 149.

In Russell vs. Southard, the court said : " The deed (absolute) and memorandum certainly import a sale ; the question is, if their form andt erms were not adopted to veil a transaction differing in reality from the appearance it assumed."

In this case stress was laid by the court upon the fact that the price paid was not adequate for the real value of the land. Id., 149, 150, 151.

Also that one witness understood the transaction to be a loan and mortgage, and not a sale. Both of these elements are in the case at bar.

In the case of Russell vs. Southard, the answer set forth a complete, absolute, and unconditional sale ; but the court

held it did not overcome the facts and circumstances tending to establish a loan of money. (Id., 151, 152, 153, 154.) Every sentence of the opinion of the court in this case is applicable and decisive of the case at bar in favor of appellant.

In Morris vs. Nixon, (1 How., 118 and 119,) the court said: "Where there is proof of parties meeting upon the footing of borrower and lender, with an offer to secure the lender by a mortgage upon particular property, if a deed of the property absolute on the face of it be given to the lender, and the lender also takes a bond from the borrower, equity will interpret the deed to be a security for money loaned, unless the lender shall show by proofs that the borrower and himself subsequently bargained upon other footing than a loan."

In the case at bar, defendant's answer expressly admits that the parties meet upon the footing of borrower and lender, with an offer to secure the lender by a mortgage upon particular property.

The burden of proof, then, is shifted to Porter to prove that he and Matthews subsequently bargained upon another footing. He does not do this, but on the contrary it appears that they never treated with each other as to the price or value of the land. 16 Ala., 501.

The case of Babcock vs. Wyman (19 Howard) is to the same effect. The deed was absolute, and there was no agreement in writing to reconvey or treat the transaction as a mortgage. The grantee sold the property, and was decreed to account to the grantor for the excess above what the grantor owed the grantee. 19 How., 289, 299, 300.

All the cases above cited affirm the doctrine that parol evidence is admissible to prove that a deed absolute upon its face was intended as a mortgage upon a general averment that it was given for that purpose. Vide 1, 12, 19

Howard, and cases cited; 2 Cowen, 329; 1 Johns. Ch., 167; 1 Hill, p. 50, sec. 111.

The same doctrine applies in case of separate defeasance, and equity will permit a party to restrict his right of redemption, and then allow a lender to be a chancellor in his own case and prevent the judgment of the court. 1 Hil. on Mortgages, 4th ed., 72–73.

The testimony of Porter himself shows that the agreement recites a falsehood, to wit: that Porter " was negotiating a purchase of the land in question." This was artfully contrived, supposing it would estop Matthews from denying the fact, and conclusively bind him to admit that Porter did negotiate the purchase when in truth he did not. This agreement makes Matthews appear to be a tenant paying rent instead of interest. These are artful contrivances of the greedy money-lender and cannot avail him.

" If in equity it is admitted or proved that one of the documents in a transaction was not intended to be what it purports, it subjects other documents in the same transaction to suspicion." 1 How., cited supra, 119.

That the borrower has agreed to pay rent so called instead of interest does not affect his right to relief. 1 Hil., 74, 75, 66; Walling vs. Aiken, 1 McMullen Ch., 1; Spurgeon vs. Collier, 1 Ed., 55; Bloodgood vs. Zeily, 2 Caines Cas., 124; Bently vs. Phelps, 2 Wood. & Minot, 426; 39 Ala., 158.

Nor does the fact that the borrower never had the legal title in himself affect his right to redeem, if in fact he was the purchaser of the equitable right. 1 Hil., pp. 74–75, sec. 7; Walling vs. Aiken, 1 McMullen Ch., 1, note a; Pennington vs. Hanby, 2 Mumf., 40; Spencer vs. Fredenall, 15 Wis., 666; Rogan vs. Walter, et al., 1 Mis., 566, 568, 569.

" Equity will construe a conveyance as a mortgage rather than a conditional sale, if the language used and the circum-

stances of the case will admit such construction." 1 Hil., 101–102; 4 Kent, 143; Rich vs. Doane, 35 Vermont, 125; Tucker vs. Lindsey, 18 Iowa, 504; McNeil vs. Norsworth, 39 Ala., 156; 33 Ill., 475, 476, 479; 35 Ala., 334; 1 Wis., 566.

" Where defendant answers, and by his answer sets up an absolute sale to himself, he cannot be permitted to set up in defence in argument a conditional sale," and such a departure from the facts will deprive his answer of all weight as evidence on this part of the case. Russell vs. Southard, 12 How., 152.

Peculiar cases where the transaction was held to be a security for money : Merritt vs. Judd, 14 Cal., 59; 4 Cal., 97; 13 Ind., 129; 25 Vt., 558; 5 Mich., 231; 46 Ill., 451; 31 Pa. St., 295; 31 Pa. St., 131; 22 Cal., 330; 1 Paige, 617; 3 Jones Eq., 427, 429; 8 N. J., 4 Halst., 206; 2 Dev. Eq., 470; 38 Ill., 400; 26 Conn., 213; 34 Vt., 166; 31 Conn., 1.

In all cases of doubt the court leans to the conclusion that the reality was a mortgage and not a sale. 12 How., 152; 7 Cranch, 218; 2 Sumner, 533; 2 J. J. Marsh., 471; 3 J. J. Marsh., 354; Crane vs. Bonnell, 1 Green Ch., 264; 1 Dev. Eq. Cas., 373.

Porter himself had doubts about his right to sell, and applied to lawyers for advice. *Vide* Porter's testimony.

ESTOPPEL.

It may be claimed that Matthews is estopped from denying that Porter negotiated the purchase from Byrne, because it is so recited in the agreement.

But Porter's own testimony shows that the recital is untrue, and that the agreeement is made to speak falsely for the very purpose of creating a false statement over Matthews' signature to injure and defraud him.

This recital is fraudulent, and parol testimony is admissible to show the truth, on the same principle that such testi-

mony is admissible to show that a deed was intended as security.

Besides, where two parties sign a deed, particular words of recital may be the words of one party only. Herman on Estoppel, sections 242, 252, 244, 266, 268.

Estoppel will be suppressed when it would produce fraud, its object being to prevent fraud. Id., sections 243, 269, 240, 231; 12 How., 145, where contract states that complainant had sold to defendant.

*Pattison & Meek* for Appellee.

*Construction of Contract.*—" A distinction is to be observed between the construction of a contract and the correction of a mistake." 2 Parsons on Contracts, 5th edition, page 496.

The complainant does not, either in his bill or in his testimony, claim that a mistake was made, but relies upon the contract of March 25, as expressing in the fullest sense the intention of the parties (complainant and defendant) thereto. But if it were contended by the complainant that a contract was made by him which he did not intend to make, even then a court of equity would not interefere and permit him to set up " a contract which the parties intended to make, but did not make, in the place of one which they did make but did not intend to make." Parsons on Contracts, 5th edition, Vol. II., page 497.

Neither complainant nor defendant pretend that the contract of March 25, 1869, and in proof in this cause by the consent of both parties, was a contract that he, the complainant, did not intend to make, but, on the other hand, both complainant and defendant rely upon said contract as expressing just what both intended in the premises.

*The Purpose of Construction.*—" Indeed the very idea of construction implies a previous uncertainty as to the mean-

ing of the contract, for where this is clear and unambiguous there is no room for construction, and· nothing for construction to do." Ibid., page 500·; Story's Eq. Jur., Vol. I., Secs. 153, 54, 55, 56, 57, &c.

In this cause the said contract speaks for itself. Nor does the complainant, either in his bill or in his testimony, claim that the contract is ambiguous and uncertain, but in both his bill and in his testimony he relies upon it as expressing his intention.

*The Effect of Defendant's Answer.*—" The plaintiff, to answer an allegation which he makes, thereby admits the answer to be evidence. In such case, if the defendant in express terms negatives the allegations in the bill, and the bill is supported by the evidence of only a single witness affirming what has been so denied, the court will neither make a decree, nor send the case to be tried at law, but will simply dismiss the bill." 1 Greenleaf's Evd., Sec. 260; also 3 Greenleaf's Evd., entire Sec. 248.

There is no witness but the complainant who attempts to affirm what is denied by the answer, and the material parts of his testimony is but a restatement of the allegations of his bill; all else is outside the bill, and is contradicted by the defendant and Doctor Hall. The answer denies, totally denies, every allegation of the bill.

The written contract of March 25, 1869, already referred to, and part of the proof in this cause, creates a tenancy for· years, as well as a pledge or bond for a deed, as it is commonly called, upon the performance of the covenants therein.

By the terms of said contract the time for paying the purchase money for the land in question is extended one year upon the payment of $500 yearly rent in advance. This the complainant failed to do, and after a reasonable time had elapsed the defendant notified the complainant, as a tenant, to quit the premises, which he did. This appears from the testimony of both complainant and defendant.

From the proof on file complainant had it in his power to pay the whole or part of the purchase money, or at least the yearly rent of $500 in advance, and thereby extend his time of payment of purchase money by the sale of products grown on the land and scrip. The latter he declined to sell at less than its then cash value.

Complainant claims that the deed from Byrne to Porter was a mortgage from complainant to defendant, or to have the effect of such mortgage. This cannot be. All the leading cases where a deed, absolute on its face, has been adjudged by the courts of last resort to be a mortgage, have been where the parties, vendor and vendee, or their legal representatives, have been the litigants. The facts, as stated, are wholly different from those of the case at bar.

Those cases show in every instance an oppressed debtor in the hands of a merciless and advantage-taking creditor, and in one or two instances the borrower in a debtor's jail.

The facts, as they appear in the case at bar, that the complainant is an anxious land speculator and desires to carry on his business as such at the expense of the defendant.

"To give the effect of a lien to the possession of the deeds, it must be shown affirmatively that they were deposited as a *bona fide* present, immediate security." 1 Wash. on Real Property, page 534.

But if the deed for the land in question was direct from Matthews to Porter, in connection with the said contract, even then we contend the deed would not be a mortgage, but a sale absolute with a conditional agreement to reconvey. In support of this position we would respectfully call the attention of the court to the following authorities:

"A. granted to B. in fee for $7,000, and B. by another instrument leased to A. for one year, and covenanted to reconvey to him for $8,000 at A.'s election within the year. *Held*, An absolute sale, with a conditional agreement for a reconveyance. Where there is no debt or loan, an agree-

ment to resell does not change an absolute conveyance into a mortgage.". 2 Edw., 138; 2 Ball & Beatty, 274; 2 Sch. & Lefroy, 393; 1 Vt., 268; Vin. Abr. Mort. U., 8; 7 Cranch (2 Curtis), 218; 4 Kent's Com., 144; Sugdon on Vendors, 223; 1 Powell on Mort., 130.

"A mere agreement to re-convey the premises within a limited period upon the repayment of the consideration money, or any other sum, where there is no subsisting debt or continuing liability of the grantor for the payment of the money, either express or implied, is not sufficient to convert such a conditional sale into a mortgage." 19 Wend., 578; 2 Edw., 138; Holmes vs. Grant, 8 Paige, 243.

"A conveyance, in consideration of the discharge of previous debts, with an agreement that the purchaser shall convey to the vendor, upon his paying a specified sum at the end of one year, together with the value of the improvements made in the meantime; *Held*, An agreement of sale and repurchase and not a mortgage." Robinson vs. Cropsy, 6 Paige, 480, affirming 2 Edw., 138.

"Where a creditor, having a demand to about the value of the land, received a conveyance of it from the debtor in discharge of the debt, giving him as a separate transaction a stipulation that if he could find a purchaser in a year he should have the purchase money beyond the debt and interest; *Held*, That the transaction was not a mortgage." Holmes vs. Grant, 8 Paige, 243.

"A debtor conveyed absolutely to his creditor, in payment of the debt, the creditor covenanting to convey on the request of the former within the year, retaining only a certain amount of the debt and interest, and that if the land could not be sold within the year he would pay the debtor such further sum for it as might be awarded by arbitrators; *Held*, Not a mortgage but a sale, and, therefore, proof of usury in the consideration was not admissible to avoid it." Baker vs. Thrasher, 4 Den., 493.

"A conveyance to one who agreed to pay off incumberances, and to reconvey on being repaid; *Held*, not a mortgage." Grinstone vs. Carper, 3 Paige, 421.

"When the owner of a bond and mortgage, made by a third person, applies to another to make a loan on the security thereof, who refuses to do so, but purchases them at less than their face and takes a transfer, which recites a sale at a sum named and conveys them in pursuance thereof, the transaction will not be treated as being in effect a mortgage, merely because the purchaser gives his covenant to the vendor to resell them to the latter within a time named and on conditions specified. In the absence of all evidence of the inadequacy of the consideration paid, and of any personal liability of the vendor to refund, in any event, the money received as the price of the transfer, the covenant will be treated as a conditional sale." Querk vs. Rodman, 5 Duer, 285.

"To convert a deed absolute on its face into a mortgage, a contract to that effect must be clearly proven." Supreme Court of Penn., 1875 ; Plummer vs. Guthrie, cited in Central Law Journal, page 67 ; 76 Penn. State R., page 441.

Neither bill, answer nor proof in this cause disclose an existing debt owing by complainant to defendant.

Second. Neither was there a loan pending, and the only loan referred to in the proof was the one that for some time previous to the transaction in question had been closed up by the complainant giving mortgage security on lands on the Ocklawaha river.

From all the facts in this case the complainant is not entitled to the relief he seeks and prays for in his bill, upon the principle that until he does equity he is not entitled to equity.

MR. JUSTICE WESTCOTT delivered the opinion of the court.

On the 25th day of March, A. D. 1869, articles of agree-

ment were mutually signed by the parties to this contro-
versy, as follows:

"Articles of agreement made the 25th day of March, in the
year eighteen hundred and sixty-nine, between William F.
Porter, of Brighton, Massachusetts, of the first part, and
John O. Matthews, of Marion county, Florida, of the sec-
ond part: whereas, the party of the first part is negotiating
for the purchase from one C. C. Byrne of the following lands,
viz: Lots numbers one, two, three, four, six and seven, in sec-
tion-twenty-two of township twelve south, of range twenty-
two east, containing one hundred and ninety-eight 45-100
acres; also lots numbered one, two, three, four, five and six,
in section twenty-one of township twelve south, of range
twenty-two east, containing two hundred and eighty-seven
72-100 acres—all in Marion county, Florida. Now, if the
said negotiation should be successful, and the party of the
first part should effect the purchase of lands aforesaid, then
and in that case only these parties contract and agree each
with the other as follows, to-wit:

"The party of the first part covenants and agrees to exe-
cute and deliver unto the party of the second part, his heirs,
executors, administrators or assigns, (at any time, on demand,
within twelve months from the delivery to the party of the
first part, or his agent, of the deed for said land by said
Byrne,) a good and perfect conveyance in fee simple for the
said lands, free and discharged from all claims for dower on
the part of the wife of the party of the first part; provided
and upon condition nevertheless, that the party of the sec-
ond part, his executors, administrators or assigns, pay to
the party of the first part, his executors, administrators or
assigns, for the said lands, within the said twelve months,
the sum of two thousand five hundred dollars, lawful money
of the United States.

"It is further agreed between these parties, that if the
party of the second part should fail to make said payment

within the said twelve months, that then and in that case the time for such payment and the operation of this agreement shall be further extended, from year to year, for a period not exceeding two years, on condition that the party of the second part shall, before such extension be made, pay to the party of the first part five hundred dollars for the rent of said lands for the first year, after the expiration of the said twelve months, and at the end of that year the further sum of five hundred (500) dollars for the rent of the lands for the second year.

"It is further agreed that the party of the second part shall, during the continuance and operation of this agreement, have the right to dig up and remove from said land such wild orange trees and shrubs as he pleases, on the condition that he shall leave at reasonable distance for an orange grove one hundred orange trees on each acre that he removes trees from, and shall bud with sweet orange buds the said trees, and care for and cultivate them.

"It is further agreed that the party of the first part shall have the right at all times, within three years from the time this agreement takes effect and commences to operate, to remove for his own use, but not for sale, twenty thousand wild orange trees or shrubs from said land, provided he leaves standing at distance apart, suitable for an orange grove, one hundred trees on each acre from which he removes trees; and, provided further, that he shall pay to the party of the second part twenty-five dollars for such trees in case the party of the second part perfect the purchase of said land."

The other portion of the instrument is merely formal, except that Matthews subsequently covenants that he "shall, during the continuance of this agreement, pay all taxes and legal assessments now due or to become due on the lands herein mentioned."

On the 25th day of May, 1868, Charles C. Byrne, for him-

self and as attorney in fact for the other owners of the land, executed a deed of conveyance, reciting a consideration of " one thousand nine hundred and forty-four dollars to them in hand paid by William F. Porter, of Brighton, in the State of Massachusetts," and conveyed all of their interest in the land to Porter. On the 2d day of January, A. D. 1871, Porter and his wife, in consideration of five thousand dollars to them in hand paid by James A. Harris, executed a deed in fee simple to the property to him. After notice to quit by Porter to Matthews, Harris obtained possession.

The foregoing papers give the proper title to the land in controversy, as well as the transactions between the parties, so far as they are shown by written evidence having any important bearing upon the subject. It is admitted that Matthews, at the time of the notice to quit, and when the deed to Harris was executed, had failed to comply with his covenants. Upon the face of these papers all the interest which Matthews had in the land was a conditional tenantry, with the right to purchase for a given sum within a stated time. Having failed to perform his covenants, his interest, which was conditional, ceased upon their non-performance, in accordance with the terms of the agreement. Upon the face of these papers he has no equity. The only absolute property which he was to have was conditional under this agreement, the conditions of which he failed to perform.

While this is the clear legal effect of these instruments, the plaintiff contends that under color of these deeds, and in fact and in truth, the true transaction was not as here disclosed. His position is that the money, which was the consideration for this land, was borrowed by him of the defendant; that the deed was taken in defendant's name to secure the re-payment of the same; that the defendant took advantage of his necessities and distresses taking an absolute deed; that the true transaction was a mortgage; that in equity he had the right to redeem, and that upon the sale of the land

he is entitled to the difference between the mortgage debt and the purchase-money received by the defendant.

The general rule that parol evidence is admissible to show that what appears upon the written papers to have been an absolute sale of property by A. to B. was in truth and in fact a mortgage to secure a loan of money by B. to A., and where there is evidence of a loan, of distressed circumstances of the borrower, and of inadequacy of the consideration, courts of equity incline to consider the transaction a mortgage. This is the legal proposition which the citations of the appellant here established. Russell vs. Southard, 12 How., 145; Morris vs. Nixon, 1 How., 118; Babcock vs. Wyman, 19 How., 289; 2 Cowen, 324; 4 Mumf., 140; 2 Mumf., 40; 15 Wis., 666.

The difference, however, between all of these cases and the case under consideration is, to our minds, manifest and material, even accepting the facts to be as stated by the plaintiff himself. At the time the articles of agreement were executed between these parties (March 25th, 1869,) neither the plaintiff nor the defendant had any interest, legal or equitable, in these lands. The property was then owned by Byrne and others, whom he represented. Byrne had offered to sell the land to the plaintiff for $1,944. The plaintiff had accepted the offer, and the agent of Byrne had advised him that unless the money agreed upon as a cash price was paid the offer would be withdrawn.

In all of the cases above referred to the plaintiff was dealing with property to which he had title, legal or equitable, which he could make the subject of a mortgage, and which he could tender as security for a loan. There is a manifest difference between Porter's negotiating for an interest in the property of Matthews and an application of Matthews to Porter to loan him money to buy property belonging to some one else. This is the difference between the facts in the cases cited and the facts here.

There is another material difference. In all of the cases where an absolute deed was held to be a mortgage, there was a difference in the value of the property covered by the deed and the consideration which passed. Accepting the evidence of the plaintiff himself here, we find that the price paid was that fixed by the owner of the land *at the time* as the cash sum for which he was willing to sell his entire property in it, and that another party (Mr. Porter) had declined to take it as security for a loan for that amount. It is true that the plaintiff testifies to a greatly enhanced value subsequently, as well as to subsequent offers of a much larger sum per acre than it cost; but admitting the truths of these statements, (and in one of them he is contradicted by Hall, a disinterested witness,) it is clear that the value, *at the time of the contract*, is the material fact.

There is still another difference. Matthews was not in enbarrassed or distressed circumstances; he was endeavoring to borrow money to buy land; he was seeking to borrow money to enter into a speculation; he was not a debtor in jail wishing to borrow money upon a pledge of property; he was not threatened with legal proceedings looking to his imprisonment for debt or likely to result in any sacrifice of property; his position was not one of distress or embarrassment, within the meaning of the authorities controlling the subject.

In referring to the authorities cited by the appellant we have omitted two, because the points of difference between them and this case are not of a similar character to the points of difference between the cases referred to above and this. These cases are Rogan vs. Walker, 1 Wis., 568, and Walling vs. Aiken, McMullen's Eq., 14. In the first case the court held that the deed and bond executed by the parties vested in Rogan a right of redemption. In disposing of the case, the Justice, delivering the opinion, says: "The relations of the parties and their respective rights, as hereinbefore stated,

result inevitably from the deed and bond recited in it. I have been unable to put any other construction upon it. The view taken of it by the counsel for the defendant, it seems to me, is in direct conflict with the very terms of the instrument, and there is nothing in the transaction as developed by the recitals or language of the deed that would authorize a different construction than that which the very words imply." In addition to this, Rogan had a settler's claim to the land, "such as under the circumstances was necessary to Walker, such as he did recognize and profit by." The release of such a claim has been held also by the Supreme Court of Iowa to be a sufficient consideration for an advance of the purchase-money and the creation of a trust. 3 Iowa, 527.

It certainly will not be contended in this case that upon the face of the deed of Byrne, and the agreement between the plaintiff and defendant, there was a right of redemption in Matthews. Nor can it be contended that upon the face of these papers there is anything to establish either a resulting or constructive trust.

In the other case, Walling vs. Aiken, the relation between the parties was determined by the nature of the written agreement and deed between them. Says Chancellor Harper for the court, "the conveyance of the lands, connected with the written agreement between the complainant and the defendant, constitute a mortgage or security." There is no pretence that this can be said of the written agreement and deed here.

Where there are such differences, the judgments of courts in the one case cannot control in the other, and this disposes of the theories and citations of the plaintiff.

Most of the citations of the defendant go to show in what cases a transaction is held to be a conditional sale and not a mortgage. As to this we remark that under no possible reasonable construction of the facts in this case is there a

sale by defendant to plaintiff, either conditional or otherwise.

With these comments on the case, as presented by the parties, we consider the case as presented by the record. The basis of the claim of the plaintiff is his alleged purchase of Byrne, and the payment of the consideration for the deed. If there was in fact a loan of nineteen hundred and forty-four ($1944) dollars by defendant to the plaintiff in this case, and the conveyance for the land for which this money was the consideration was taken in the name of the defendant, these facts presented above, independent of the prior agreement of the parties and the other evidence, would constitute a resulting trust. The defendant would be a trustee, and would be subject to the liabilities, legal and equitable, of trustees in a like position, and if it was the intention of the parties, in view of all the evidence, that the defendant was to hold this land as security for the amount stated in the agreement, and as security for debt, we are inclined to the view that upon these facts the plaintiff would not be without equities. What these equities would be we do not propose to declare, unless the case presents that question, and we therefore inquire, does this record present that case, and if not, what case is presented upon the pleadings and proofs? The first question to be here determined is, what are the rules of evidence where, contrary to the express language of the deed and the denial of the defendant, the plaintiff seeks to prove the fact that the money was his, and thus establish a resulting trust for his benefit? Having fixed this rule, its application ends the consideration of this case.

Such a trust is not within the statute of frauds, and may, under the circumstances stated, be proved by parol testimony, but the evidence is to be received with great caution.

In the case of Boyd vs. McLean, (1 John. Chy., 590,) Chancellor Kent, in discussing this question, says: "The

cases uniformly show that the courts have been deeply impressed with the danger of this kind of proof as tending to perjury and the insecurity of paper title, and they have required the payment by the *cestui que trust* to be clearly proved. In the case of Lench vs. Lench, Sir William Grant did not deem the unassisted oath of a single witness to the mere declaration of the trustee admitting the trust as sufficient, and there were no corroborating circumstances in the case. He thought the evidence too uncertain and dangerous to be depended upon. It would be easy to multiply instances of the like caution and discretion, and the only inquiry is whether here is not convincing and satisfactory proof of the *loan* to the plaintiffs, and consequently the payment of the consideration in the deed with *their moneys.*" It is unnecessary to multiply extracts from parallel cases establishing this rule. In the cases following it is held that in such a case as this, " the clearest and the strongest testimony must be produced." 2 Blackf., 198; ib., 440; 1 Dana, 536; 13 Mrld., 257; 3 Iowa, 371; 1 Wend., 625; 2 Wend., 570; 1 Barb. Chy., 499.

Controlled by this rule we ask, is the trust here established? In the first place, it is not denied that the money which Byrne received was paid by defendant. Porter gave a draft upon his own money in favor of Byrne. Again, there is no note or obligation given by plaintiff to defendant making this sum a debt due to defendant. Just here we may remark that some of the courts hold that "if the party claing the resulting trust has paid no money, he cannot show by parol evidence that the purchase by absolute deed and for a valuable consideration was made for his benefit." (T. & B. on Trusts, 447; 3 Ind., 308; 27 Penn. St., 180.) But it is insisted that the money thus paid by defendant was really lent by him to plaintiff; that it was a payment for plaintiff; and without reference to the distinction suggested in these cases, we examine the evidence and case.

Looking to the pleadings, we find that the plaintiff in his bill alleges that the money ($1944) was lent to him by the defendant; that he made the purchase of the land with it and agreed to pay interest thereon. He then affirms, "all of which will fully appear in and under the said agreement entered into between this complainant and the said defend-. ant, which was reduced to writing, which said writing is now in the custody, control, and possession of the said defendant, the said Wm. F. Porter, which, if inspected by the court, will exhibit the same state of facts herein set up, and which is prayed the said defendant may be required to produce." The plaintiff alleges further that he entered upon the land under the agreement between him and Porter. The defendant answers that the plaintiff applied to him for a loan of $1944, but that it is not true that he ever effected such loan. He admits the execution of an agreement in writing with the plaintiff, wherein he agreed to sell the land to him upon his payment of the purchase-money therein agreed upon. He further says that plaintiff paid no part of the purchase-money, and that he has failed to perform his covenants. Defendant also alleges that he purchased the lands of Byrne through the agency of Matthews; that the deed was made to him as such purchaser, and that he paid Matthews for his services as such agent the sum of $90. It thus appears from the plaintiff's case, as stated by himself in his bill, that his contract and agreement with the defendant was reduced to writing, and he expressly affirms that this instrument of writing "will exhibit the same state of facts" that he sets up as the basis of his equities. This agreement was not in his possession. He was here speaking from his recollection of its contents. He rested his case upon its written stipulations and recital, and asked its production. The agreement was subsequently produced. It is inserted in the beginning of this opinion. A reference to it will show that it does not recite these facts, but that on the con-

trary it recites a negotiation by the defendant with Byrne for the purchase of the land, and that the agreement is to sell the lands to plaintiff upon the terms stated, of one of which, the express condition is that the defendant should effect the purchase. Upon the bill and answer above, coupled with this agreement, therefore the plaintiff has no case. We will, however, go further and examine the testimony. The first witness is the plaintiff himself. He states that he was introduced to the defendant as a gentleman who had money to loan; that he visited the land with him; that defendant agreed to lend him the money to purchase it, the defendant insisting finally that the deed should be in his name, and that he would give an agreement so that plaintiff's rights would be protected. He then states, " I think this agreement was reduced to writing. I know an agreement was reduced to writing which embraces all the points already testified to." Here then he rests his case upon the agreement not then before him. He speaks from memory. The agreement produced, his case vanishes. To say the least, he has made a great mistake in his own favor when in pursuit of property claimed by another. How forcibly does this case impress upon us the importance of strictness in the rule as to explaining written agreements by parol testimony. This witness, in stating the final agreement between himself and defendant, says : " There was an agreement between us on the night before the papers were signed that the defendant should give me a bond for a title. When we went to the office of Sanderson & L'Engle, attorneys, the next morning, instead of what I regarded as a bond for title, the agreement I have testified to was drawn up."

All of this occurred before Porter paid the money to Byrne, and before the plaintiff had any interest in the land. It is not seen how plaintiff could have expected a bond for title from the defendant, except upon the hypothesis and understanding that the defendant was

to acquire a title. It certainly was not expected that he would contract to give a bond for a title that he was not to acquire. This clear admission is inconsistent with the idea that the plaintiff was to pay for the land with borrowed money, and is entirely consistent with the view that the final agreement and determination was for Porter to purchase the land for himself, availing himself of the offer of Byrne to Matthews. There are other matters which might be alluded to in the testimony of this witness, but enough has been said to show how entirely unreliable it is, as well as to establish that there is nothing in it to clearly prove the fact that the consideration for the deed was money borrowed of the defendant by the plaintiff.

C. L. Robinson, the next witness for the plaintiff, testifies that he knew the plaintiff and defendant had transactions as to real estate in Marion county, but that he did not know all of the details; that much of the conversation was had in his office in regard to what he considered " at first " to be a loan between the parties; that before the delivery of the deed of Byrne to Porter, he understood the transaction was to be a loan; that all of the conversation that he heard was to the effect that the place was purchased by Mr. Matthews, or for his benefit, making it a loan; that he kept the written contract between the parties in his office for many weeks, but never examined it thoroughly. This testimony is not inconsistent with the fact that the final transaction between the parties was not a loan. This witness expressly states that he did not know all the details, and admits his ignorance of the terms of the written agreement, which both parties agree was the final contract. The plaintiff himself states that the final conclusion of the parties was not reached until the night before the day of the execution of the agreement or upon that day, and what this witness states is entirely consistent with a want of knowledge of what then transpired. Even the defendant himself does not deny that

he was willing to loan the plaintiff money to buy the land,. but it was to be a loan, upon the condition that the plaintiff would pay his own money, one-fourth or one-third of the purchase money.

Again, even if the defendant consented to loan the whole of the money, there was nothing to bind him, and a simple *consent* in conversation to loan does not constitute a loan in fact. There was a statement that he would loan unaccompanied by the fact of loan, and without any consideration passing. In addition to this, there is the admission of the plaintiff that the final agreement and understanding was as it is written.

The other material testimony in the cause bearing upon this question is that of the defendant. He denies any loan. As to the whole transaction he says : " Before the agreement was reduced to writing, Mr. Matthews wanted the land on better terms, but after the agreement was written, as that contained the only terms upon which I would buy the land,. Mr. Matthews did not object." In view of this record can it be said that the consideration paid for this land is " clearly and fully established " to have been the money of the plaintiff ? The equities alleged in the bill are really disproved by the very paper which the plaintiff stated, under his oath as a witness, constituted conclusive evidence of them. The material allegations of the bill are expressly denied by the answer. There is but one witness for the plaintiff who speaks to the loan. His own statements show that he was not acquainted with the entire transaction ; that he was ignorant of, or had forgotten, the terms of the final written agreement, and in addition to all this, the deed between Byrne and Porter recites that the consideration was paid by Porter.

We cannot declare that a resulting trust is established by such testimony, or that the plaintiff was ever either a legal or equitable mortgagor. On the contrary, the written agree-

ment measured plaintiff's rights.    Having failed to perform
his covenants, he has no equitable right to the land, or to
any part of the money for which it was sold.    We think the
decree of the Circuit Court dismissing the bill was correct,
and, therefore, the decree is affirmed.